**UNITED STATES of America and William N. Jackson, Special Agent, Internal Revenue Service,**

v.

**Gustav J. CRESPO, as president and George J. Smith, Jr., as vice president, of Remington Sales Bureau, Incorporated.**

**Misc. No. 559.**

United States District Court
D. Maryland.

March 22, 1968.

James Jeffries, III, Attorney, Tax Division, Department of Justice, Washington, D. C. (Mitchell Rogovin, Asst. Atty. Gen., Tax Division, and Fred B. Ugast, Chief, General Litigation Section, Department of Justice, Washington, D. C., and Stephen H. Sachs, U. S. Atty., and Clarence E. Goetz, Asst. U. S. Atty., Baltimore, Md., on brief), for petitioners.

C. Gordon Haines, Michael J. Abromaitis and Wright, Robertson & Dowell, Baltimore, Md., for respondents.

THOMSEN, Chief Judge.

This is a proceeding brought by the United States and a Special Agent of the Internal Revenue Service (IRS) under sections 7402(b) and 7604(a), IRC, 1954,[1] to compel compliance with two administrative summonses issued to Gustav J. Crespo, as president, and George J. Smith, Jr., as vice president, of Remington Sales Bureau, Incorporated, the taxpayer, demanding their testimony and the production of certain corporate books and records for the period April 1, 1963 through March 31, 1965, alleged to be necessary for a determination of its income tax liabilities for the years ending March 31, 1964 and March 31, 1965.

---

[1]. All section references herein, unless otherwise indicated, will be to sections of the Internal Revenue Code of 1954, 26 U.S.C.

Crespo owns 60% of the stock of taxpayer, Smith the remaining 40%; there were no other stockholders during the years in question.

A hearing has been held to permit respondents to show cause why they should not be compelled to obey the summonses. During the hearing petitioners entered into a stipulation with Smith, which resulted in the dismissal of the action against him. Crespo has raised the following questions: 1. Whether the IRS has already conducted "one inspection" of the books and records of the corporate taxpayer for the tax years in question, as the quoted term is used in section 7605 (b)? 2. Whether the summons was issued for a legitimate purpose? 3. Whether enforcement of the summons would constitute an unreasonable search and seizure in violation of the Fourth Amendment? 4. Whether enforcement of the summons would violate respondent Crespo's Fifth Amendment privilege against self-incrimination?

*Statutes*

Section 7602, dealing with the examination of books and witnesses, provides:

"For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary or his delegate is authorized—

"(1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry;

"(2) To summon the person liable for tax or required to perform the act, or any officer or employee of such person, or any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any other person the Secretary or his delegate may deem proper, to appear before the Secretary or his delegate at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry; and

"(3) To take such testimony of the person concerned, under oath, as may be relevant or material to such inquiry."

Section 7604(a) and section 7402(b) contain almost identical language. Section 7604(a), dealing with the enforcement of summons and the jurisdiction of district courts, provides:

"If any person is summoned under the internal revenue laws to appear, to testify, or to produce books, papers, records, or other data, the United States district court for the district in which such person resides or is found shall have jurisdiction by appropriate process to compel such attendance, testimony, or production of books, papers, records, or other data."

Section 7605(b) provides:

"(b) Restrictions on examination of taxpayer.—No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary or his delegate, after investigation, notifies the taxpayer in writing that an additional inspection is necessary."

*Findings of Fact from Evidence*

The tax returns of the corporate taxpayer for the fiscal years ending March 31, 1963, and March 31, 1964, were assigned in regular course to Henry Weider, a revenue agent, in September 1964. Between that time and March 1967, Weider examined the general ledger and adjusting accounts, cash receipts and disbursements books, bank statements, cancelled checks and check stubs, and the minute book of the corporation. He did not see the purchase invoices or correspondence between the corporation and M. C. Ramos, Commercial Envelope Co. or Standard Register Co., except the pur-

chase invoices of M. C. Ramos. The corporate return for the year ending March 31, 1965, was also assigned to Weider, as were the individual returns of Crespo, to which Weider gave some attention in February 1966, when he had several conversations with Crespo. Extensions of the statute of limitations were obtained from the corporation and from Crespo, so that Weider could complete his examination of the early years. In March 1967 Weider completed his examination for the year ending March 31, 1963, and wrote up reports on that year for the corporation and on the calendar years 1962 and 1963 for Crespo. On April 11, 1967, notices of deficiency were sent to the corporate taxpayer for the fiscal year ending March 31, 1963, and to Crespo et ux. for the calendar years 1962 and 1963. Petitions challenging those deficiencies were filed in the Tax Court by those taxpayers in July 1967; the cases are still pending in that Court.

While working on the aforesaid reports, in March 1967, Weider became aware of the possibility of fraud in connection with the returns of the corporate taxpayer and, in accordance with established practice, suspended his work and referred the matter to the Intelligence Division of the IRS.

A revenue agent, such as Weider, examines income tax returns and determines correct tax liabilities. He is not empowered to investigate criminal tax fraud, and when his examination reveals the possibility of fraud he must suspend his examination and refer the matter to the Intelligence Division for resolution of the fraud question.

When a referral is made to the Intelligence Division, a special agent is assigned to make a preliminary investigation. The primary duties of a special agent are the investigation of possible criminal violations of the income, estate, gift, employment and excise tax statutes, the development of information concerning possible criminal violations of those statutes, the evaluation of such information, and the recommendation of prosecution when warranted.[2]

After a case is referred to a special agent, he may determine that further investigation by the Intelligence Division is not warranted. If, however, he believes that further investigation is warranted, the case becomes a joint investigation with the revenue agent. The special agent, however, is in charge of that investigation. If the investigation develops the probability of criminal fraud, the special agent submits a report recommending prosecution.[3]

**2.** See statement of Organization and Functions promulgated by the Internal Revenue Service, 30 Fed.Reg. 9399–9400 (July 28, 1965), 1966 CCH Stand.Fed.Tax.Rep. Sec. 5988, which Special Agent Jackson agreed was applicable to him.

"1118.6 Intelligence Division.

"The Intelligence Division enforces the criminal statutes applicable to income, estate, gift, employment, and excise tax laws (except those relating to alcohol, tobacco, narcotics and certain firearms), by developing information concerning alleged criminal violations thereof, evaluating allegations and indications of such violations to determine investigations to be undertaken, investigating suspected criminal violations of such laws, recommending prosecution when warranted, and measuring effectiveness of the investigation and prosecution processes. The Division assists other Intelligence offices in special inquiries, drives and compliance programs and in the normal enforcement programs, including those combating organized wagering, racketeering and other illegal activity, by providing investigative resources upon regional or National Office request. It also assists U. S. Attorneys and Regional Counsel in the processing of Intelligence cases, including the preparation for and trial of cases."

**3.** If approved, the recommendation goes to the Assistant Regional Commissioner (Intelligence) for review and possible rejection. If approved by the Assistant Regional Commissioner, it goes to the Regional Counsel who can also reject or concur. From Regional Counsel the recommendation goes to the Chief Counsel of the Internal Revenue Service and also to the Department of Justice. If approved by the Department of Justice, the case goes to the United States At-

The function of the revenue agent in such an investigation is to assist the special agent by advising him of what the revenue agent has previously learned, and by participating in such further examination of the books and records of the taxpayer and others as may be necessary to determine the correct tax liability. The determination of the correct tax liability is an essential part both of the determination by the special agent whether there has been any criminal fraud, and of the determination by the revenue agent of the tax deficiency, if any, and the propriety of assessing civil fraud penalties. The special agent's report of the results of his investigation are made available to the revenue agent to assist him in computing the civil tax liability of the taxpayer under investigation. This information is transmitted to the revenue agent whether or not fraud is found, whether or not prosecution is recommended, and whether or not a conviction is ever obtained. The results of the special agent's investigation will always affect the revenue agent's computation by raising, lowering or verifying the revenue agent's computation.

The Intelligence Division referred this corporate taxpayer's case to Special Agent William N. Jackson.[4] During the course of his investigation, Jackson determined that it was necessary to examine certain corporate books and records of corporate taxpayer pertaining to the tax years involved. On April 19, 1967, in accordance with sections 7602 and 7603, Jackson issued and personally served summonses upon respondent Crespo, as president of corporate taxpayer, and upon Smith, as vice president of the corporation,[5] calling on them to produce certain books and records of corporate tax-

payer. Crespo and Smith appeared before Special Agent Jackson pursuant to the summonses issued to them but refused to testify or produce the records demanded. None of the books, records or documents demanded by the summonses are in the possession of the United States or of Special Agent Jackson. Nor, with the exception of two or three cancelled checks, are any copies of the demanded documents in the possession of the government. Special Agent Jackson has not seen any of the books or records demanded.

## Discussion

1. Respondents contend that the IRS has already conducted one inspection for the tax years in question, so that section 7605(b) prohibits another inspection in the absence of notice from the Secretary. Respondents argue that section 7605(b), quoted above, contains two separate restrictions: first, "[n]o taxpayer shall be subjected to unnecessary examination or investigations"; second, "only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary or his delegate, after investigation, notifies the taxpayer in writing that an additional inspection is necessary".

Respondents do not contend that taxpayer is being subjected to "unnecessary examinations or investigations". Such an argument would be without merit.[6] Respondents rely only on the absence of a notice from the Secretary or his delegate.

The government argues that the intent and meaning of section 7605(b) is that such a notice is necessary only when the investigation, including a sufficient in-

---

torney for prosecution. The grand jury, of course, can decline prosecution.

4. The investigation of a corporate taxpayer by the Intelligence Division would normally include any criminal fraud on the part of an individual corporate officer whether or not there were indications of such at the time of referral.

5. A special agent is a delegate of the Secretary of the Treasury empowered to issue summonses under the authority of section 7602 and Treasury Regulation § 301.7602–1 (TD 6421, October 23, 1959, and TD 6498, October 24, 1960).

6. See Application of Magnus, 299 F.2d 335 (2 Cir. 1962) and cases cited in note 9.

spection of the taxpayer's books and records, has been completed and a determination of the tax liability for the year or years in question has been made. The government's position is given effect in Revenue Procedure 64–40, Cumulative Bulletin 1964–2, p. 971, 26 C.F.R. 601.105, the pertinent parts of which are set out in note 7 in the margin.

Both sides cite portions of the legislative history to support their respective contentions.[8] However, neither the legislative history nor the few court decisions referring to section 7605(b) which have been cited or found are conclusive of the issue. Most of the cases involved factual situations quite different from that presented in the instant case.[9]

Respondents cited In re Paramount Jewelry Co., 80 F.Supp. 375 (S.D.N.Y. 1948), in which the court held that an investigation that had involved an examination of the taxpayer's books three or four times during the past two years should not be halted as unnecessary by vacating a direction that books and records be produced but that, if the taxpayer insisted, it was entitled to receive a notice that an additional inspection was necessary before being required to produce the taxpayer's books for a fourth or fifth time. That case has apparently been cited only once, in Application of Magnus, 196 F. Supp. 127, 128 (S.D.N.Y.1961), where it was summarized substantially as set out above in an opinion dealing with a different question. On appeal in the *Magnus* case, the Second Circuit did not cite the *Paramount Jewelry* case, but noted that an investigation "often requires a long period of time. There may be many ramifications which lead into many areas. Each new clue investigated is not a new investigation in a Section 7605(b) sense." 299 F.2d 335, at 337 (2 Cir. 1962). Similarly, the fact that a revenue agent has seen a cash book, journal or ledger once does not mean that he may not need to see it again for a different purpose.

7. Revenue Procedure 64–40 reads in pertinent part:
"Section 1. *Purpose.* The purpose of this revenue procedure is to restate and supersede Revenue Procedure 63–9, C.B. 1963–1, 488, which sets forth the conditions under which cases closed by examination in the office of District Director of Internal Revenue may be reopened.
"Section 2. *Scope.*
".01 For the purpose of this procedure, a case is considered closed when a taxpayer has been notified in writing of an adjustment to his tax liability or the acceptance of the return as filed.
".02 This procedure does not include any action pertaining to the reopening of cases or issues under the jurisdiction of the offices of the Appellate Division or the Regional Counsel.
"Section 3. *Conditions for Reopening.*
".01 It is the administrative practice of the Internal Revenue Service not to reopen cases previously closed by the District Director, unless—
"1. There is evidence of fraud, malfeasance, collusion, concealment or the misrepresentation of material fact; or

"2. The prior closing involved a substantial error; or
"3. Other circumstances indicate that failure to reopen would be a serious administrative omission. * * *"
A Policy Statement contained in Internal Revenue Manual, section P–4020–2, approved September 14, 1962, adds: "Reopenings resulting from post-review action must have the approval of the Assistant Regional Commissioner (Audit). Reopenings at the District level must have the approval of the District Director."

8. 61 Cong.Rec. 5202 (1921); Sen.Rep.No. 275, 67th Cong., 1st Sess., p. 31; H.Rep. No. 337, 67th Cong., 1st Sess., p. 16; 8A Mertens, Law of Federal Income Taxation, § 47.48, p. 140.

9. United States v. Powell, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964); United States v. Howard, 360 F.2d 373 (3 Cir 1966); Reineman v. United States, 301 F.2d 267 (7 Cir. 1962); National Plate & Window Glass Company, Inc. v. United States, 254 F.2d 92 (2 Cir.1958); Norda Essential Oil & Chemical Co., Inc. v. United States, 253 F.2d 700 (2 Cir. 1958); United States v. United Distillers Products Corporation, 156 F.2d 872, 873 (2 Cir. 1946).

■ This Court does not accept the government's position that a notice from the Secretary is never needed unless the investigation, including a sufficient inspection of the taxpayer's books and records, has been completed and a determination made of the tax liability for the year or years in question.[10] When the investigation has not been completed, the question whether a further examination of the books and records would constitute a second "inspection" within the meaning of section 7605(b) depends on the circumstances. If such examination of the books and records is part of a continuing investigation, made necessary by the discovery of invoices, correspondence, or other material which requires the agent to look at the books again, such examination is not a second "inspection" within the meaning of section 7605(b).

The taxpayers and other people of the United States have an interest in seeing that income tax returns are carefully audited, and that revenue agents investigate leads which indicate that a taxpayer has understated his taxable income, intentionally or unintentionally. But taxpayers and other people also have an interest in requiring that the work be done as promptly as is practicable, and that they are not harassed by investigations which are prolonged beyond any reasonable need, or by repeated examinations of their books and records unless such further examinations are required by the discovery or development of new leads.

■ The Courts are not in a position to require that all agents operate with the same efficiency, or to pass on what individual books and records an agent may re-examine as the result of a new lead. But the Courts should intervene when taxpayers are able to show that agents have abused their discretion in wielding the extensive powers granted to them by the Internal Revenue Code.

■ In the present case respondents Crespo and Smith did not testify themselves, but rested on the testimony of the two agents. From the evidence the Court finds that by March 1967 Revenue Agent Weider had made a sufficient examination of the corporate taxpayer's books and records for the fiscal year ending March 31, 1963, to be able to complete his report for that year. On the other hand, Revenue Agent Weider has not yet completed his report for the years ending March 31, 1964 and March 31, 1965. He has examined some of taxpayer's records for those years, but has not seen other items, e. g., correspondence with M. C. Ramos, Commercial Envelope Co. and Standard Register Co., nor the purchase invoices of the latter two concerns. He desires, and the evidence shows that he needs, further information with respect to those items, because of various questions which have arisen as to the propriety of certain claimed deductions relating to those transactions.

This Court concludes that the original investigation of the corporation's tax liabilities for the years ending March 31, 1964, and March 31, 1965 is continuing and that the production of the books and records for those taxable years would not amount to a second inspection within the meaning of section 7605(b). Therefore, notice from the Secretary or his delegate to examine taxpayer's books and records for the taxable years ending March 31, 1964 and March 31, 1965 is not required.

2. Respondents' second contention is that the summons was not issued for a legitimate purpose. As noted above, section 7602 provides for an examination and summons:

"For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, * * *."

10. Certainly, such a notice is needed under those circumstances, and would be needed here if the government were seeking to examine the books and records for the year ending March 31, 1963.

935

■ Respondents claim that the purpose of the summons in the case at bar is *solely* for criminal investigation, that such a purpose is not mentioned in section 7602 and, therefore, that a summons to be used for such a purpose is not enforceable under the statute. Respondents cite United States v. Powell, 379 U.S. 48, 57, 85 S.Ct. 248, 255, 13 L.Ed.2d 112 (1964), which places the burden on the Commissioner of Internal Revenue to "show that the investigation will be conducted pursuant to a legitimate purpose * * *."

The Court finds that the burden enunciated in *Powell* has been sustained. Upon the referral to Special Agent Jackson, the case became a joint investigation with Jackson in charge. It did not become solely a criminal investigation, as respondents contend. The revenue agent and the special agent have continued and must continue to work together on the case, inasmuch as the civil and the criminal aspects of the investigation are necessarily interrelated. For example, the correct tax liability must be established before any criminal proceedings could be initiated. Conversely, the existence or non-existence of fraud will always affect the computation of the correct tax liability. Therefore, the investigation of the corporate books sought here has dual purposes which are interrelated to each other.

■ Such a joint investigation is within the purview of section 7602. See e. g., McGarry v. Riley, 363 F.2d 421 (1 Cir. 1966), cert. den. 385 U.S. 969, 87 S.Ct. 502, 17 L.Ed. 433 (1966); Wild v. United States, 362 F.2d 206 (9 Cir. 1966); Sanford v. United States, 358 F.2d 685 (5 Cir. 1966). See also United States v. Foster, 309 F.2d 8 (4 Cir. 1962).

■■ 3. Respondents' third contention is that enforcement of the summons would constitute an unreasonable search and seizure in violation of the Fourth Amendment. Although it is true that the Fourth Amendment does protect a corporation from an unreasonable search and seizure, see Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), Fleming v. Montgomery Ward & Co., 114 F.2d 384 (7 Cir. 1940), cert. den. 311 U.S. 690, 61 S.Ct. 71, 85 L.Ed. 446 (1940), respondents have not shown that enforcement of the summons in the case at bar would be unreasonable. Respondents do not even contend that the summons is overly broad, sweeping, or indefinite, or that there is no basis for the probable existence of the records. See Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906), United States v. First Nat. Bank of Fort Smith, Ark., 173 F.Supp. 716 (W.D.Ark.1959), and United States ex rel. Sathre v. Third Northwestern Nat. Bank, 102 F.Supp. 879 (D.Minn.1952), appeal dismissed, 196 F.2d 501 (8 Cir. 1952), where these contentions were made.

■ In the absence of such a showing, the summons *per se* does not violate the Fourth Amendment. See Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 208–209, 66 S.Ct. 494, 505, 90 L.Ed. 614 (1945), where the Supreme Court said:

"Without attempt to summarize or accurately distinguish all of the cases, the fair distillation, in so far as they apply merely to the production of corporate records and papers in response to a subpoena or order authorized by law and safeguarded by judicial sanction, seems to be that the Fifth Amendment affords no protection by virtue of the self-incrimination provision, whether for the corporation or for its officers; and the Fourth, if applicable, at the most guards against abuse only by way of too much indefiniteness or breadth in the things required to be 'particularly described', if also the inquiry is one the demanding agency is authorized by law to make and the materials specified are relevant. The gist of the protection is in the requirement, expressed in terms, that the disclosure sought shall not be unreasonable.

"As this has taken form in the decisions, the following specific results

have been worked out. It is not necessary, as in the case of a warrant, that a specific charge or complaint of violation of law be pending or that the order be made pursuant to one. * * * "

See also Ryan v. United States, 379 U.S. 61, 85 S.Ct. 232, 13 L.Ed.2d 122 (1964); United States v. Powell, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964); and United States v. Culver, 224 F.Supp. 419, 427, aff'd sub nom. United States v. Grow, 394 F.2d 182 (4 Cir., March 18, 1968).

Inasmuch as the purpose of the summons here is lawful and no indefiniteness or over-breadth has been shown, enforcement of the summons does not constitute an unreasonable search and seizure.

4. Respondents' final contention is that enforcement of the summons would violate their Fifth Amendment privilege against self-incrimination.

The principles controlling the limitations on the government's right to seize and examine private documents date back to Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), where the Supreme Court held that the Fourth and Fifth Amendments together preclude judicial warrants for searches and seizures of an individual's private papers in a search for evidence of fraud against the revenue laws. In Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906), however, the Court held that a corporate officer could not refuse to produce corporate books and papers on the ground of the Fifth Amendment privilege. The denial of the privilege in *Hale* was based on the need of the sovereign to maintain visitorial powers over corporations. In Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911), the Court held that the custodian of corporate records could not refuse to produce the records on Fifth Amendment grounds even though he might personally be incriminated by the contents.[11] In Grant v. United States, 227 U.S. 74, 33 S.Ct. 190, 57 L.Ed. 423 (1913), the Court denied the right of a corporation to as-

sert the privilege even when the corporation had only one stockholder.

■ The above cases indicate that the custodian of corporate records cannot refuse to produce the records on Fifth Amendment grounds even though the contents may incriminate him, and even though the corporation has few stockholders. Respondents argue, however, that United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944), dictates a different rule.

In the *White* case, a subpoena was served on the president of a labor union to produce before a federal grand jury, certain books and records of the union. The president refused to produce the documents on the ground that they might tend to incriminate the union and himself. The Court denied the right of the union officer acting in his official capacity to invoke the privilege. At the same time, the Court said, 322 U.S. at 699, 64 S.Ct. at 1251:

"Since the privilege against self-incrimination is a purely personal one, it cannot be utilized by or on behalf of any organization, such as a corporation. * * * Moreover, the papers and effects which the privilege protects must be the private property of the person claiming the privilege, or at least in his possession in a purely personal capacity."

Despite the above statement, respondents argue that *White* stands for a new test to be utilized in deciding whether an individual officer may refuse to produce corporate records, viz., that a factual inquiry should be made to determine the true nature of the corporation, and, *a fortiori*, when dealing with a two-stockholder corporation, the majority stockholder should be allowed to invoke the Fifth Amendment privilege to prevent the government from obtaining corporate books and records in his possession.

To date, no court has accepted this argument even when the corporation had only a single stockholder. See, e. g.,

11. See also United States v. Hopps, 331 F.2d 332, 340 (4 Cir. 1964).

Wright v. Detwiler, 345 F.2d 1012 (3 Cir. 1965); Hair Industry, Ltd. v. United States, 340 F.2d 510 (2 Cir. 1965), cert. den., 381 U.S. 950, 85 S.Ct. 1804, 14 L.Ed. 2d 724 (1965); United States v. Guterma, 272 F.2d 344 (2 Cir. 1959); Christianson v. United States, 226 F.2d 646 (8 Cir. 1955). The strongest authority for respondents on this point is the dissenting opinion of Judge Madden in Wild v. Brewer, 329 F.2d 924 (9 Cir. 1964). Judge Madden dissented on Fifth Amendment grounds from the majority's enforcement of a summons to produce corporate records against a president, sole-stockholder of a corporation. However, even this opinion was restricted to a single stockholder corporation, and Judge Madden indicated that the entrance of even one more stockholder into the picture might alter the situation. 329 F.2d at 928.

Therefore, it is clear that the Fifth Amendment privilege against self-incrimination does not allow respondent Crespo to refuse to produce the corporate records in the case at bar. That privilege is purely personal, and may not be invoked by a corporate officer on behalf of corporate records. Respondents' argument that in certain areas of the law a corporation may choose to be treated as a partnership does not require a different result. Here, the corporate form was chosen and cannot be discarded merely because an income tax investigation is under way.

It should be noted that nothing herein affects respondents' right to move to suppress or object to any evidence which may be obtained in violation of any constitutional right, if and when any of the respondents may be criminally prosecuted. See United States v. Blue, 384 U.S. 251, 255, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966); Sanford v. United States, 358 F.2d 685 (5 Cir. 1966); United States v. Avila, 227 F.Supp. 3 (N.D.Cal. 1963). Nor does enforcement of the summons restrict either respondent's right to assert his personal privilege against self-incrimination by refusing to answer specific questions under oath.

See Curcio v. United States, 354 U.S. 118, 77 S.Ct. 1145, 1 L.Ed.2d 1225 (1957); Maffie v. United States, 209 F.2d 225 (1 Cir. 1954); Marcello v. United States, 196 F.2d 437 (5 Cir. 1952). The availability of these remedies is further reason for not allowing respondents to refuse to produce the corporate records and thereby hinder or prevent the correct assessment of a civil tax liability, when no criminal prosecution has as yet been instituted.

The petition for enforcement of the summons served on respondents is hereby granted. An appropriate order will be entered.