469 F.2d 977
 72-2 USTC P 9745
 UNITED STATES of America and Hillary E. Goode, Special
Agent, Internal Revenue Service, Plaintiffs-Appellants,
v.
Seymour SCHWARTZ, as President of Carson's of Atlanta, Inc.,
and Carson's of Fort Lauderdale, Inc., et al.,
Defendants-Appellees.
 No. 72-1222.
 United States Court of Appeals,
Fifth Circuit.
 Nov. 13, 1972.
 
 Scott P. Crampton, Meyer Rothwacks, Asst. Attys. Gen., Tax Div., Dept. of Justice, Washington, D. C., John W. Stokes, Jr., U. S. Atty., Julian M. Longley, Jr., Asst. U. S. Atty., Atlanta, Ga., Charles E. Anderson, Atty., Tax Div., Dept. of Justice, Washington, D. C., for plaintiffs-appellants.
 Samuel Appel, Atlanta, Ga., for defendants-appellees.
 Before TUTTLE, BELL and AINSWORTH, Circuit Judges.
 TUTTLE, Circuit Judge:
 
 
 1
 The United States and Hillary E. Goode, Special Agent, Internal Revenue Service, appealed from the order of the trial court dismissing their petition to enforce an Internal Revenue summons against Patricia Long, bookkeeper, and Seymour Schwartz, president, for the production of certain described books and records of Carson's of Atlanta, Inc. and Carson's of Fort Lauderdale, Inc. The trial court dismissed the petition on the ground that "the Government seeks a second inspection of the documents listed in its summons but declines to comply with Sections 7605(b) of the Internal Revenue Code of 1954 and with the requirements of United States v. Powell, 379 U.S. 48, 85 S.Ct. 248, 13 L. Ed.2d 112 (1964).
 
 
 2
 Section 7605(b) of the Internal Revenue Code of 1954, dealing with the requirements imposed upon the Internal Revenue Service when it seeks a second inspection of a taxpayer's books of acount provides as follows:
 
 
 3
 "Restrictions on examinations of taxpayer.
 
 
 4
 No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary or his delegate, after investigation, notifies the taxpayer in writing that an additional inspection is necessary."
 
 
 5
 The requirements of United States v. Powell, supra, as they relate to the present case, will be discussed below. Essentially, they deal with the requirement of a showing that the information sought by the summons was not within the Government's possession.
 
 
 6
 The factual setting before the trial court at the time of its dismissal of the petition was formed by affidavit and counter-affidavit by Special Agent Goode for the United States and Mrs. Long and Mr. Appel, Counsel for Appellees, for the appellees, together with oral testimony given by the Special Agent at the hearing for motion to dismiss. Although some of the affidavits are ambiguous, it is clear that the following facts are undisputed on the record. During the latter part of 1969 an examination of the corporate records of the two Carson corporations was being conducted by Special Agent Goode and other agents of the Internal Revenue Service. During that time the agents had been given "free access to all of its records" which continued until counsel was employed at which time counsel demanded that Special Agent Goode "list the documents he wished to examine". Special Agent Goode refused to do this and thereupon counsel advised the Special Agent that respondent's records would not be furnished him.
 
 
 7
 Thereupon, the special agent issued a summons which covered only the following items:
 
 
 8
 "(1) All Paid Invoices
 
 
 9
 (2) Cash Disbursement Journals
 
 
 10
 (3) All Cancelled Checks and Bank Statements."
 
 
 11
 Upon refusal of appellees to comply with the said summons it was judicially enforced by an order of the district court on June 17, 1970. This order provided:
 
 
 12
 "Such examination shall continue from day to day until completed."
 
 
 13
 Subsequently, Carson;s bookkeeper, Mrs. Long, was ill for several months. But on March 4, 1971, she testified with regard to the tax liabilities of Carson's of Fort Lauderdale, Inc., and on March 11, 1971, she gave testimony with regard to the tax liability of Carson's of Atlanta, Inc. Then, according to the affidavit of Mr. Goode, which was not disputed, the following transpired:
 
 
 14
 "Your affiant asked her to review an invoice and advise if Carson's, Inc. had paid the invoice. She replied that the corporation had paid the invoice. The invoice represented a payment for the personal benefit of the corporation president. Your affiant next asked Patricia Long if the corporation president had reimbursed the corporation for the expenditure. She replied that she could not anser the question without an examination of the daily proof journals, in addition to the sales journal she had in front of her. She explained that some cash sales had not been entered on the corporation records as sales but were entered on the records as recoveries of bad debts and she would have to check those entries back to the daily proof sheet to answer the question."
 
 
 15
 The parties are in disagreement as to what then transpired.
 
 Mr. Goode's affidavit says:
 
 16
 "An agreement was reached between all persons present that Internal Revenue Agent Hudson and your affiant would go to the office of Carson's of Atlanta, Inc., on Friday, March 12, 1971 and extract only the pages from the daily proof journal that Mrs. Long would need to answer the question, and that Mrs. Long would come back to the Internal Revenue office on Monday, March 15th and complete her testimony."
 
 
 17
 On the other hand, Mr. Appel, counsel for appellee, by his affidavit, states:
 
 
 18
 "Mrs. Long informed Special Agent Goode that the daily proof journals would have to be examined to determine the answer to such questions [the question as to whether the corporation president had repaid the amount to the corporation]. After discussion concerning the best method for accomplishing such an examination, Mr. Goode insisted that Mrs. Long review the daily proof sheets and furnish him with answers to a list of questions which he would submit concerning receipt of payments by respondent corporations. At that point, deponent states that respondents were advised that such request was unreasonable and unduly burdensome in its demand and would cause undue interference with the conduct of respondent's business.
 
 
 19
 The enforcement proceedings, Civil Action #15230 resulted because of such refusal."
 
 
 20
 The trial court did not resolve the question whether a mutual agreement had been made by Mr. Goode and Mrs. Long and her counsel to reconvene on March 15th, as stated in Mr. Goode's affidavit. Although this is not directly rebutted in any affidavit on behalf of appellees, Mr. Appel's affidavit having been executed on the 17th of August, 1971, and Mr. Goode's having thereafter been executed on the 23rd of August, Mr. Appel implies that there was no agreement about any further production of documents. Nevertheless, it is not disputed that, as stated by Special Agent Goode in his affidavit:
 
 
 21
 "On Friday, March 12, 1971, at 8:20 a. m. Attorney Appeal called your affiant and stated that he would advise Patricia Long not to testify to facts that required her to go to the daily proof journal since that journal was not included in the court order of June 16, 1970." (Emphasis supplied.)
 
 
 22
 Thereafter, Special Agent Goode issued a summons to Mrs. Long and Mr. Schwartz, requiring them to appear and produce the following documents: (1) daily proof journals used by the above corporations for recording cash sales, credit sales, cash receipts and bad debt recoveries. (2) All subsidiary and source documents necessary to support and explain the aforementioned documents in connection with determining the tax liability of this taxpayer. (3) Certain payroll checks (not relevant to this inquiry).
 
 
 23
 On March 29, 1971, Mrs. Long and Mr. Schwartz appeared, but each refused to testify or to produce any of the books, records or other documents described above. Thereupon the United States and Special Agent Goode filed the proceedings with which we are here concerned.
 
 
 24
 Additional facts which developed upon the hearing are that Special Agent Goode, who was in charge of the investigation, testified that he did not examine or inspect the "daily proof journals," but that on several occasions Mrs. Long had traced certain cash sales to certain daily journals.[1] Agent Goode was not able to testify of his own knowledge that none of the other agents made any other or further examination of the daily proof journals, although Mrs. Long's affidavit does contain the following statement, which conflicts with any idea that all 4,000 sheets[2] were readily available or spread out for the inspection of the agents in the offices of the corporation:
 
 
 25
 "Upon later investigation, I found that the daily proof journals for Carson's of Atlanta were all located in the basement of the corporation's office in Atlanta, Georgia. The proof journals for Carson's of Fort Lauderdale are located in Fort Lauderdale with the exceptions of the journals for the year 1967, which cannot be located."
 
 
 26
 Thus, the sum of it all is that the special agent was engaged in his original investigation, which had once been terminated by counsel for the company's president and bookkeeper; a court order was obtained requiring the bookkeeper, Mrs. Long, to appear and produce certain records other than the "daily proof journals"; after the investigation showed certain payments by the corporations on behalf of the president and other officials of the companies, the agents were faced with a prima facie case of irregularity or distortion of the companies' income; in order to give the companies an opportunity to rebut this inference, Mrs. Long was asked whether Mr. Schwartz and the other officers had reimbursed the companies.[3] She replied that she could not answer without referring to the daily proof journals, because such reimbursements were sometimes treated as "Cash Sales" (no explanation having been given why they were so treated) and they appeared on the daily proof journals but then were carried on to the permanent books of record in a lump sum for the day.[4]
 
 
 27
 In order to answer Special Agent Goode's questions relative to the advances to officers, Mrs. Long said they would have to go the daily proof journals; when Mr. Goode and Mrs. Long were unable to arrive at a mutually agreeable time and place to inspect these daily journals, counsel for Mrs. Long called off any inspection of these particular books since "he would advise Patricia Long not to testify to facts that required her to go to the daily proof journal since that journal was not included in the court order of June 16th, 1970;" thereupon, Goode went to the district court a second time, and sought enforcement of a summons which, for the first time, included the "Daily Proof Journals"-the summons with which we are now concerned. It is to be remembered that the original order for the production of the books that were adequate to show the irregularities, contained the following language:
 
 
 28
 "Such examination shall continue from day to day until completed."
 
 
 29
 Mrs. Long objected, by anser, on the grounds that this second subpoena would be a "second inspection" of the books of the taxpayer and, as such, it was prohibited by Section 7605(b) of the Internal Revenue Code of 1954.
 
 
 30
 (b) Restrictions on examination of taxpayer.-No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary or his delegate, after investigation, notifies the taxpayer in writing that an additional inspection is necessary." 26 U.S.C.A. Section 7605(b)In support of her position, in which Mrs. Long claims the taxpayers' privilege as excusing her from responding and producing books for a "second inspection", Mrs. Long stated in her affidavit that all the books and records were made available to Mr. Goode and the other agents, including a number of references to the daily receipts journals (but see comment above) although they were not covered by the original summons. If that is the posture she wishes to take, then she clearly shows that the privilege to see them was abruptly withdrawn after she made the suggestion that they were the only (although abnormal) source of information to exculpate the officers from a prima facie case of improper disbursements of corporate funds.
 
 
 31
 Either this is a failure of Mrs. Long to comply with the first order, if she wishes to include these daily proof journals among the books "inspected" the first time (since that order directed that the books made available from day to day until such examination was "completed"); or there was never a "first inspection" in the sense in which the term is used in the statute, because the investigation had not been completed under the court's order to continue it from day to day and the need for the particular books is not a part of the agents' inquiry, but is for the purpose of enabling the bookkeeper to answer the one simple question of whether the officers had reimbursed the companies; or, if this summons is construed as a "second inspection" which we think it was not, then, in all reason, it must be held that the "second inspection" requirement was satisfied when Mrs. Long[5] "requested" this reference to the daily proof journals (the second inspection). By any common sense approach, this statement of Mrs. Long that she could tell the special agents whether these payments had been refunded by the corporate officers only by reference to these daily journals constituted a "request" that the journals be consulted in order that, if repayments had been made, she could testify to this fact and the officers and the companies would be exculpated.
 
 
 32
 In view of the commissioner's statutory duty to "cause officers or employees of the Treasury Department to proceed, from time to time, through each internal revenue district and inquire after and concerning all persons therein who may be liable to pay any internal revenue tax. . . .", 26 U.S.C.A. Section 7601, and to examine records and data and to require persons liable for taxes and others to give testimony and produce records relevant thereto "for the purpose of ascertaining the correctness of any return . . . determining the liability of any person for any internal revenue tax . . . or collecting any such liability," 26 U.S.C.A. Section 7602, it is clear that the limitations contained in 7605(b), supra, must be liberally construed to permit the Commissioner to carry out these duties imposed by law as stated in deMasters v. Arend, CA 9, 313 F.2d 79. There the Court of Appeals for the Ninth Circuit said:
 
 
 33
 "These grants of power [Section 7601 and 7602, supra] are to be liberally construed in recognition of the vital public purposes which they serve [citing Falsone v. United States, 205 F.2d 734, 742 (5th Cir. 1953)]; the exception stated in Section 7605(b) is not to be read so broadly as to defeat them [citing Application of the United States, 246 F.2d 762, 765 (2nd Cir. 1957)]. A limited construction of Section 7605(b) is also supported by the law's general antipathy to the erection of barriers to the ascertainment of truth [citing Application of Magnus, 299 F.2d 335, 337 (2nd Cir. 1962), McMann v. SEC, 87 F.2d 377 (2nd Cir. 1937)], and the policy against judicial intervention in the investigative stage of tax matters because of the danger of undue delay in the collection of the revenues [citing Enochs v. William Packing Co., 370 U.S. 1, 7, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962)]."
 
 
 34
 We think that the statement in the statute "Only one inspection of a taxpayer's books of account shall be made for each taxable year" is to be read in pari materia with the first clause of the Section: "No taxpayer shall be subjected to unnecessary examination or investigations". This seems to be the original purpose of the statute which was initially enacted as Section 1309 of the Revenue Act of 1921. See United States v. Powell, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112, for a discussion by the Supreme Court of the legislative history dealing with the matter.
 
 
 35
 It is not clear from appellees' brief precisely how they would construe the Section, but it seems apparent that for the court to construe this statute as contended for by them, an agent or special agent could not see the same books more than once during a continuing investigation without following the rocedure of giving written notice for each day's "look" at the books. We do not believe the use of the word "inspection" in Section 7605(b), as contrasted with the words "unnecessary examination or investigations" can be so restricted as to mean that there is an "inspection" every time the agent or special agent looks at a book of account of a taxpayer. The word "inspection" must, in all reason, have some relation to the activities of the agents in making the examination authorized under the statute. The meaning seems to have been well understood by the district court in connection with this taxpayer at the time of its first order enforcing the summons, for there the court directed that "such examination shall continue from day to day until completed". Certainly the trial court could not have intended that while such examination was continuing it would be necessary for the Commissioner of Internal Revenue or his delegate to give a notice in writing under Section 7605(b) of each daily need to inspect any of the books or records of these companies.
 
 
 36
 What happened here is that without having made any "inspection" of the set of books or, rather, file of loose leaf pages called daily proof journals, although, during the course of the continuing examination, the agents traced items to certain of these pages, the witness who was subject to subpoena and was undergoing this continuing examination, was asked a question which she stated she was unable to answer without referring to these daily proof journals. Thereupon the special agent said, in effect, "Well, let's have them". Thereupon, because counsel said these particular documents were not named in the original order to enforce the first summons, the witness could not be questioned with respect to matters which she could answer only by reference to these records. This amounts to nothing more than a clear failure of the witness to comply with the original order of the court, requiring her to continue to testify from day to day until the examination was completed. If it was necessary for her to obtain the answer to the inquiries made by Mr. Goode by going to records of the company, which had not thus far been subpoenaed, then she was at liberty to do so. Rather than doing this she, and subsequently her counsel, cast the transaction in the form of a demand by Mr. Goode of the right to "inspect" the daily proof journals.
 
 
 37
 Even assuming there had been such a demand, initiated by the special agent, it is clear that there had not been any first "inspection" in the sense in which the word is used in the statute. It is clear that the trial court's order, touching upon the books actually mentioned in that order, provided for a day to day inspection of those records. Thus, when in order to exculpate the taxpayer and its official from a prima facie case of distortion of income, the bookkeeper said she could answer only by reference to the daily proof journals, this amounted in fact to a tender of the journals to the special agent for that purpose. At the very least, it could be turned around into a request by the agent for access to these journals to enable Mrs. Long to continue with her deposition. Such a request would not be a demand for a second "inspection".
 
 
 38
 The district court seemed preoccupied with the thought that it was such a simple matter for the Internal Revenue Service to give a written notice that it was futile to have this litigation over such a refusal by taxpayers' representative to make books available. It is to be noted, however, that the statute speaks of notifying "the taxpayer in writing" and "after investigation" that "an additional inspection is necessary". Thus, it is not a perfunctory letter-writing job. Moreover, if this became necessary for every day of inspection or every request for a new set of journals during a continuing investigation, the administration of the tax laws would become a shambles, once an investigation of a taxpayer's true tax liability commenced.
 
 
 39
 It is significant that the Internal Revenue Service does not treat the giving of a notice required under Section 7605(b) as a perfunctory matter, it deals with the matter of a second inspection on the assumption that it relates to an inspection following the closing of an examination by the agents. In such situation the Internal Revenue Service has issued regulations providing that there shall be no re-openings except:
 
 
 40
 "1. There is evidence of fraud, malfeasance, collusion, concealment or misrepresentation of a material fact; or
 
 
 41
 2. The prior closing involved a clearly defined substantial error based on an established Service position existing at the time of the previous examination; or
 
 
 42
 3. Other circumstances exist which indicate failure to reopen would be a serious administrative omission." See Rev.Proc. 68-28, 1968-2 Cum.Bull. 912, Section 4.01.
 
 
 43
 The Revenue procedure also provides that the notice to the taxpayer required by Section 7605(b) must be signed by the Regional Commissioner. If each "look" by the agents of books of a taxpayer must be authorized only after such a notice, issued after investigation where evidence of one of the three itemized circumstances above referred to has been found, it is clear that litigation arising under this section could easily frustrate the completion of an investigation into even the simplest corporate affairs. We think this is not contemplated by this statute.
 
 
 44
 Although there were different circumstances before the court in United States v. Giordano, 419 F.2d 564 (8th Cir., 1970), nevertheless, we think that the standard of construction of this section of the statute must be one that "could not possibly and reasonably lend itself to a construction that would preclude the Government from making at least one meaningful examination of the books of account for the years involved", 419 F.2d 564, 567, without the necessity of having a written notice given to the taxpayer for each days' look at the books.
 
 
 45
 So, too, the Court of Appeals for the Second Circuit, in National Plate and Window Glass Company v. United States, 254 F.2d 92, although dealing with an initial examination that was very short, nevertheless, stated the proper principle when it said, "The cursory examination of the taxpayer's records on February 28, 1957 was not shown to have completed the investigation: it did not constitute an 'inspection' within the meaning of this statute", 254 F.2d 92, 93.
 
 
 46
 It will be noted that both of these courts held, in effect, that there had not been a first "inspection", so as to require the statutory notice before the second inspection of the books.
 
 
 47
 In United States v. Crespo, 281 F.Supp. 928, 933 (DMd 1968), the trial court equated the "inspection" dealt with in this section with an investigation. The court there said "Similarly, the fact that a revenue agent has seen a cash book, journal or ledger once does not mean that he may not need to see it again for a different purpose." The court went on to hold that when an investigation has not been completed, such examination is not a second inspection within the meaning of the statute requiring written notice.
 
 
 48
 We agree with this concept of the meaning of the word "inspection", rather than a meaning that would make it necessary for the Internal Revenue Service to conduct an investigation each time there had been one look and determine that it was necessary to furnish a written notice for a second look to complete an ongoing investigation.
 
 
 49
 The appellees here also undertake to support the trial court's order of dismissal on the ground that the Government failed to show that the information sought by the summonses was not already in the Government's possession. We conclude that the trial court's determination that there was no sufficient showing on this point to satisfy the requirements of the United States v. Pritchard, CA 5, 1971, 438 F.2d 969, is clearly erroneous. The affidavits as quoted above, together with the testimony of Mr. Goode at the hearing, clearly demonstrated that the company's bookkeeper herself did not have this information and that in order to get it reference would have to be made to what the trial court spoke of as 20,000 pages (testified to by the witness as 2,500 pages in Atlanta and 1,500 pages in Fort Lauderdale) to be able to answer his question. This is clearly sufficient to show that the information was not in the possession of the Government.
 
 
 50
 The judgment is reversed and the case is remanded to the trial court with directions that an order be entered requiring the enforcement of the summons.
 
 BELL, Circuit Judge (dissenting):
 
 51
 The majority opinion proceeds upon an assumption that there are two possible interpretations of Sec. 7605(b)[1]: one that would allow the Service to make the inspection it requests here, without giving notice; and one that would require the Service to invoke the notice procedure for every new day of inspection, or for every request for new books of account. Finding the latter interpretation unacceptable, since it would "frustrate the completion of investigation into even the simplest of corporate affairs," the majority adopts the former, an interpretation which relieves the Service of the burden of giving notice with respect to any "second" inspection which is part of the same "investigation" as the first.
 
 
 52
 The majority opinion posits narrow alternatives. The logic and history of Sec. 7605(b) do not compel a Hobson's choice between a theory which would require notice to be given whenever a revenue agent sits down to look at books of account anew, and a theory which would never require notice to be given during the course of a "continuing investigation." The first theory is not required by the statute; the second saps the statute of meaning. In my view, the proper course lies between the two.
 
 
 53
 The "notice" provision of Sec. 7605(b) is not designed to warn taxpayers of impending inspections. In that sense it is not a "notice" provision at all. It is designed, rather, to curb an abuse of investigatory powers of lower-echelon revenue agents. The provision imposes this curb by reallocating decision-making power within the administrative system. Under this provision the revenue agent retains power to decide whether to conduct an initial inspection of books of account, but the "Secretary or his delegate, after investigation," must approve all subsequent inspections and give notice that they are "necessary." For a discussion of the purpose of the notice provision, see United States v. Powell, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112, 117 (1964).
 
 
 54
 The majority opinion reflects the tendency to expand the residual decision-making power of the revenue agent, either by expanding the definition of the "first" inspection, which he is entitled to make on his own, or by holding, as here, that the Secretary or his delegate need not approve additional inspections where they are part of the same "investigation" that produced the first. The tendency, as here, is to justify this conception of the agent's residual power by asserting that in the course of a continuing investigation the agent may need to inspect a book again, after he has inspected it once, and that his power to do so on his own, without approval from his superiors, should be construed in light of that need. See e. g., United States v. Crespo, 281 F.Supp. 928 (D. Md.1968).
 
 
 55
 The difficulty with this approach does not lie in the factual assumption that during the course of a continuing investigation the agent may need to look at the books again. Indeed, it is obvious that he may need to do so. The difficulty lies, rather, in the conclusion that the probable necessity of multiple inspections during the course of continuing investigations makes it unnecessary for the agent, in any given case, to seek the approval of his superiors. The conclusion is impermissible precisely because it is the necessary second inspection which the statute requires the Secretary or his delegate to approve. The continuing investigation theory has the effect of substituting a rule authorizing multiple inspections during a continuing investigation for multiple judgments which, in the contemplation of Congress, are to be made by senior IRS officials in the context of particular cases.
 
 
 56
 In rejecting such a theory one is not compelled to embrace the view that the revenue agent, having put the book down, must consult his superiors before he may pick it up again. There is nothing in the history or the language of Sec. 7605(b) that suggests that the "first" inspection must be completed in one sitting, or in one week or one month. At the same time, every consideration suggests that there is some point at which, for the purposes of the statute, an inspection of books of account, once begun, comes to an end. Otherwise, the distinction drawn by the statute between the initial inspection and subsequent ones would be meaningless, and the notice procedure would never come into play.
 
 
 57
 In the present case findings of fact by the district court, not found to be clearly erroneous by the majority, establish that the inspection of Carson's books and records began in July, 1969, and continued, for a total of at least 60 working days, through "sometime in 1970". During this period the daily proof journals were inspected at least once, though not, of course, for the purpose of securing the information the government now seeks. Did this inspection ever come to an end?
 
 
 58
 In light of the facts, the answer seems easy. It was not until March, 1971, months after the initial period of active inspection, that the government requested to inspect the proof journals again. Presumably, if Agent Goode had not uncovered the unexpected eccentricities of Carson's bookkeeping practices, after his interview with Mrs. Long, the government would never have requested that it be allowed to do so. If this is not a request for a second inspection, it is rather difficult to imagine what is.
 
 
 59
 In light of the facts, it seems entirely proper that the Agent Goode should be allowed to consult the proof journals again. A second inspection seems necessary. But that determination, as the district court held, is one that the "Secretary or his delegate" must make. For this reason I must respectfully dissent.
 
 
 
 [1]
 It appears that the daily proof journals carried cash items showing the source of the receipt of cash, which were then lumped together and posted in the journal in one lump sum. Thus, if cash repayments of amounts advanced to officers of the corporation were treated by the taxpayer as cash sales or recovery of bad debts, clearly an unusual practice and one which would distort the books of account, the identity of the source of the payment could not be determined from the journal, but could be determined only from the daily proof journal
 
 
 [2]
 Counsel, in his motion to dismiss, referred to these as being 20,000 sheets and this figure was picked up by the trial court in its discussion of the case. In point of fact there would be one sheet for each business day for the years in question for each corporation
 
 
 [3]
 In a normally kept set of books of account it would not be necessary to ask such a question. Any such repayments would be reflected by entries in an Exchange account. Here, although there was such an account, there were no such entries
 
 
 [4]
 As implausible as is this manner of handling a refund of advances to officers (leaving absolutely no proof on the general books of account of the companies that such advances had ever been repaid) such was the method Mrs. Long said might have been followed
 
 
 [5]
 Mrs. Long testified that she was authorized to work with the special agent on behalf of the corporate taxpayers
 
 
 [1]
 "Restrictions on examination of taxpayer
 "No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary or his delegate, after investigation, notifies the taxpayer in writing that an additional inspection is necessary."