BLANCHE S. BENJAMIN, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

EDWARD B. BENJAMIN, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3286-71, 3287-71.    Filed September 30, 1976.

---

*William C. Gambel,* for the petitioners.
*Paul H. Waldman,* for the respondent.

BRUCE, *Judge:* Respondent determined the following deficiencies in petitioners' Federal income taxes:

| Year | Deficiency |
|------|------------|
| 1961 | [1] $32,219.05 |
| 1964 | 79,531.28 |

An addition to tax under section 6651(a) of the Internal Revenue Code [2] was also asserted against petitioners. However,

---

[1] The 1961 deficiency is based on the disallowance of a loss carryback from 1964. If the statute of limitations does not bar a deficiency determination for 1964, then the statute is also open for 1961. Sec. 6501(h), I.R.C. 1954.

[2] All references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.

the parties have by stipulation eliminated that question from our inquiry.

The issues remaining for decision are: (1) Whether a redemption in 1964 of 2,000 shares of Starmount Corp. class A preferred voting stock from petitioner Blanche S. Benjamin, the majority shareholder, was "essentially equivalent to a dividend" under section 302(b)(1); (2) whether petitioner Blanche S. Benjamin realized constructive dividends in 1964 when the Starmount Corp. paid her sons' country club dues and a portion of the maintenance expenses on petitioners' North Carolina residence; (3) whether the assessment of a deficiency against Blanche S. Benjamin and/or Edward B. Benjamin is barred by the statute of limitations contained in section 6501(a); and (4) whether the deficiency determination against petitioners was the product of an invalid second inspection of their "books of account" prohibited by section 7605(b).

The Court granted the parties' joint motion to consolidate the two cases for trial, briefing, and opinion.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by reference.

Petitioners, husband and wife, were residents of New Orleans, La., at the time their separate petitions were filed. Petitioners filed a joint Federal income tax return for 1964 with the District Director of Internal Revenue in New Orleans. On said return no entry or notation was made of a $200,000 distribution received during that year from Starmount Corp. (hereinafter Starmount or the corporation) in exchange for 2,000 shares of class A voting preferred stock owned by Blanche S. Benjamin. Apparently the petitioners considered this distribution a nontaxable return of capital.

The parties have stipulated that petitioners' gross income as stated on their 1964 joint income tax return was less than $694,168.50 but not less than $453,075.40. The record presents no evidence as to whether the income was separate or community income.

The petitioners have presented extensive records concerning Starmount Corp. and the events leading to the 1964 partial redemption, the basic transaction at issue here, as well as a 1968 redemption which completely terminated Blanche S. Benjamin's interest in Starmount. We summarize below so much of the facts as are considered relevant and material to our inquiry and, in addition, present a brief sketch of the history of Starmount only for purposes of gaining a better perspective of the transaction involved herein.

Emanuel Sternberger, father of petitioner Blanche S. Benjamin (hereinafter Blanche) was the founder of Revolution Cotton Mills. Revolution was a corporation engaged in the textile manufacturing business in North Carolina. Prior to 1924 the majority stock interest in Revolution was held by Emanuel Sternberger, his wife, and two daughters, Blanche and Emelia. When Mr. Sternberger died in 1924, he bequeathed his Revolution stock to his wife and daughters.

In 1926 Emanuel Sternberger's heirs sold their stock interest in Revolution to certain minority shareholders. Mrs. Sternberger and the two daughters received as partial payment for their stock certain notes formerly held in the investment portfolio of Revolution. These notes were the obligation of Alfred Scales, a North Carolina businessman, and are hereinafter referred to as the Scales notes. These interest-bearing notes were secured by mortgages on 3,000 to 4,000 acres of land bordering on Greensboro, N.C. With the proceeds from the sale of their stock, including a portion of the Scales notes, Blanche and Emelia each funded separate trusts with Central Union Trust Co. of New York (predecessor of Manufacturers Hanover Bank) as trustee.

In 1928 Mrs. Emanuel Sternberger died intestate and her heirs, Blanche and Emelia, inherited their mother's estate. Each placed all or a portion of their inheritance, including the remaining Scales notes, in separate trusts with the Bank of New York & Trust Co. as trustee. Thereafter, a portion of the corpus of all four trusts consisted of the Scales notes secured by mortgages on the North Carolina property.

Emelia died on January 3, 1929, without any descendants surviving. In accordance with the terms of the agreements creating Emelia's two trusts, Blanche became the income beneficiary and her children the remaindermen of Emelia's two trusts.

The economic disaster which struck this nation in 1929 apparently cast its shadow on Blanche and her prior financial planning. In that year, Alfred Scales defaulted on his note obligations and foreclosure proceedings on the mortgaged property were instituted. The trustees expended funds from the corpus of each trust in clearing all intervening liens and in satisfying foreclosure expenses.

Blanche and the trustees formed a North Carolina corporation, Starmount, on April 10, 1929, to take title to the foreclosed property. In exchange for the defaulted Scales notes held in trust, the trusts received new notes issued by Starmount worth $1,153,135.77 (the approximate 1929 value of the entire tract of land) and 1,000 shares of Starmount no-par common stock. The new notes and stock of Starmount were distributed to the trusts in proportion to their respective holdings of the defaulted notes.

Attempts were made to sell the unimproved property subsequent to incorporation. Such attempts proved fruitless and no sales of even a portion of the property occurred until 1938. For this reason, Blanche agreed to personally lease the land so that the trusts would receive income from the Starmount securities. In addition, Blanche thereafter financed some capital expenditures and paid certain recurring charges such as ad valorem and franchise taxes.

In 1933 Blanche and the trustees agreed that a restructuring of the corporation would be beneficial particularly for North Carolina tax purposes. A recapitalization was designed whereby the Starmount debt would be exchanged for an equity interest in the form of three classes of preferred stock. Consequently, the Starmount notes previously held by the trusts were exchanged for a proportionate amount of new preferred shares. The preferred shares were issued and exchanged with the trusts on the basis of 1 share for each $100 of debt. Each class of preferred stock represented a specific debt or expenditure previously incurred as shown below.

| New preferred | Number of shares authorized | Number of shares issued |
|---|---|---|
| Class A | 7,500 | 4,682* |
| Class B | 8,000 | 7,255** |
| Class C | 5,000 | [3] 2,295*** |

*Represented amounts advanced by the trusts for foreclosure expenses and the purchase of intervening liens.

**Represented the original debt owed to Blanche and Emelia.

***Represented amounts advanced by Blanche after incorporation for the improvement of Starmount properties.

[3] After the 1933 recapitalization, Starmount issued additional class A and C preferred

The new preferred shares were of no-par value but had a call price and liquidation preference of $100 per share. The preferred shares were not entitled to participate in assets on liquidation beyond this preference. In addition, the preferred shares were given an annual $3 noncumulative dividend preference over the common stock. After payment of an annual $3 noncumulative dividend to the holders of the preferred stock, holders of the various classes of stock, preferred and common, were entitled to receive, share and share alike, regardless of class, such dividends as the board of directors might declare from time to time out of remaining surplus or net profits. A sinking fund was established in 1933 to retire the preferred shares when future land sales permitted the corporation to do so; however, the fund was discontinued in 1939.

The recapitalization in 1933 was reflected by proper amendments to the articles of incorporation. The common stock remained outstanding and all shares of stock, common and preferred, were entitled to equal voting rights.

After 1933, Blanche continued to lease the property and invest substantial sums in its maintenance and improvement.

During 1948 and 1949, Blanche desired to improve her liquidity position. She had, since the incorporation of Starmount, invested large sums in the corporation and had netted relatively little, if anything, in return since she was personally leasing the unproductive property.[4] Additionally, the trustees at this time were anxious to remove the Starmount stock from the assets of the trusts since their retention might be violative of New York law which required the trustees to hold high-yield securities. After consultation with her counsel and the trusts' legal advisers, it was determined that Blanche could revoke her two trusts under New York law[5] with the approval

---

stock. In 1935, Starmount issued 100 class A shares to Emelia's 1928 trust for consideration of $100 per share. On several occasions between 1933 and 1950, Starmount issued additional class C shares to Blanche for certain capital contributions. Blanche transferred all such additional class C preferred stock to one or more of her New York trusts.

[4] By 1949, Blanche had expended $1,213,343.18 in leasing the Starmount property and for current expenses and capital outlays.

[5] N.Y. Personal Property Law sec. 23 (McKinney 1962):

Upon the written consent of all persons beneficially interested in a trust in personal property or any part thereof heretofore or hereafter created, the creator of such trust may revoke the same as to the whole or such part thereof, and thereupon the estate of the trustee shall cease in the whole or such part thereof.

and consent of all beneficiaries and remaindermen. A revocation would permit Blanche to retain her stock interest in Starmount while freeing for her personal use other marketable securities held by the trusts.

Accordingly, Blanche detailed her intentions to her three sons, remaindermen under the trusts, in order to solicit their consent. Before giving their written consent, and without their parents' knowledge, the three sons sought the advice of a New York attorney to assure that their interests were adequately protected. This action on the part of the sons was viewed as an expression of distrust and contentiousness by Blanche and her husband. Thereafter, harmonious family relations between the parents and the sons were severely strained.

Although an atmosphere of antagonism existed, protracted negotiations between the trustees, Blanche, and her sons, resulted in an agreement executed on December 19, 1950 (hereinafter the 1950 agreement). The agreement provided, in part, that: (1) The sons would consent to Blanche's revocation of the trusts she created in 1926 and 1928; (2) marketable securities held by the revoked trusts would be exchanged for Starmount securities held in Emelia's two trusts so that Blanche would hold all the Starmount stock in her individual capacity; (3) the sons would immediately receive certain marketable securities held by the revoked trusts; and (4) Blanche would personally retain all the preferred stock in Starmount and she would donate all of the common stock of the corporation to her sons. The latter element was important because the agreement also required Blanche to amend the articles of incorporation so that the preferred shares would become the only voting stock of the corporation. Such amendments were effected.

Particularly relevant to our inquiry is paragraph No. 4 of the 1950 agreement, set forth herein:

4. Blanche Sternberger Benjamin agrees promptly to cause the Certificate of Incorporation of the Starmount Company to be amended so that all of the voting and management rights of the company will be vested solely in the Class A preferred stock and the Class B preferred stock, so long as any of said stock remains issued and outstanding, and thereafter in the Class C preferred stock and the common stock of the company with provision that the company shall not be dissolved or its charter further amended, except upon a majority vote of each of the several classes of stock of the company separately voting by class, including the Class C preferred stock and the common stock, as well as the Class A preferred stock and the Class B preferred stock. Blanche Sternberger

Benjamin further agrees that, forthwith after such amendment of the Certificate of Incorporation, she will transfer all of the common stock of said company to the parties of the first part [the sons] in equal shares as gifts. Blanche Sternberger Benjamin further agrees that after she has realized during her lifetime One Hundred Dollars ($100.) per share on each and all of the now issued and outstanding shares of the Class A preferred stock and the Class B preferred stock of Starmount Company, whether due to distributions of capital or income of said company, she will donate and transfer any then remaining Class A preferred stock and Class B preferred stock and all of the Class C preferred stock of said company to the parties of the first part, their personal representatives or assigns in equal shares, except that she shall be free to donate and transfer all or any part of any class of said stock held by her to the parties of the first part, their personal representatives or assigns in equal shares at any time in the meantime. Gift taxes, if any, assessable in respect of any such transfer of such stock shall be borne by said Blanche Sternberger Benjamin. Blanche Sternberger Benjamin further agrees that until after she has donated and transferred all of the Class C preferred stock of said company to the parties of the first part, their personal representatives or assigns, she will keep in force a Last Will and Testament containing a bequest of all the Class C preferred stock of said company owned by her at the time of her death to the parties of the first part, their personal representatives or assigns in equal shares.

These limitations on Blanche's retention of the preferred stock were not disclosed in the articles of incorporation nor in the financial statements of the corporation.

Subsequent to the agreement and through 1963, Blanche on several occasions donated shares of class C preferred to members of her family. From 1958 through 1966, except for the years 1960 and 1964, the corporation annually redeemed 10 shares of Blanche's class A preferred stock at $100 per share. As of December 31, 1963, the stock of Starmount was held as follows:

| Shareholder | Relationship to Blanche | No. of preferred shares by class | | | No. of common shares |
|---|---|---|---|---|---|
| | | A | B | C | |
| Blanche S. Benjamin____ | | 4,732 | 7,255 | 968 | |
| Edward Benjamin, Jr.___ | son | | | 730 | 313⅓ |
| Edward Benjamin, Jr.'s wife _____ | daughter-in-law | | | 60 | |
| W. Mente Benjamin ____ | son | | | 550 | 46⅓ |
| Jonathan Benjamin ____ | son | | | 550 | 333⅓ |
| Jonathan Benjamin's wife_____ | daughter-in-law | | | 60 | |
| Grandchildren _____ | grandchildren | | | 600 | 307 |
| | | 4,732 | 7,255 | 3,518 | 1,000 |

On December 7, 1964, a special meeting of the Starmount board of directors authorized the redemption of 2,000 class A

preferred shares from Blanche. Set forth below are the minutes from that meeting:

A Special Meeting of the Board of Directors of Starmount Company was held at the home of Edward B. Benjamin at 383 Walnut Street, New Orleans, Louisiana, at 1:00 P.M. on December 7, 1964.

Two of the Directors of the Company, to wit, Edward B. Benjamin and Blanche S. Benjamin were present in person at the meeting and waived all notice of the time, place and purpose of the meeting.

Edward B. Benjamin, President of the Company, acted as Chairman of the meeting and in the absence of the Secretary of the Company, Blanche S. Benjamin acted as Secretary of the meeting.

The Chairman announced that the other director of the Company, to wit, W.H. Holderness, had also waived all notice of the time, place and purpose of the meeting, that a quorum was present, and that the meeting was open for business.

On motion duly made and seconded, the following resolution was unanimously adopted:

RESOLVED, that the officers of the Company be and they hereby are authorized for and on behalf of the Company to purchase from Blanche S. Benjamin for redemption for the sum of Two Hundred Thousand Dollars ($200,000), on or before December 31, 1964, 2,000 shares of the Class A Preferred Stock of the Company.

There being no further business, on motion duly made and seconded the meeting was adjourned.

(S)   Blanche S. Benjamin
*Acting Secretary*

Approved:
(S)   Edward B. Benjamin
*Chairman*
(S)   W.H. Holderness
*Director*

As of December 31, 1964, after the redemption of Blanche's class A preferred shares, the stock of Starmount was held as follows:

| Shareholder | Relationship to Blanche | No. of preferred shares by class | | | No. of common shares |
|---|---|---|---|---|---|
| | | A | B | C | |
| Blanche S. Benjamin____ | | 2,732 | 7,255 | 968 | |
| Edward Benjamin, Jr.___ | son | | | 730 | 296⅓ |
| Edward Benjamin, Jr.'s wife _____ | daughter-in-law | | | 60 | |
| W. Mente Benjamin ____ | son | | | 550 | 32⅓ |
| Jonathan Benjamin ____ | son | | | 550 | 333⅓ |
| Jonathan Benjamin's wife_____ | daughter-in-law | | | 60 | |
| Grandchildren _____ | grandchildren | | | 600 | 338 |
| | | 2,732 | 7,255 | 3,518 | 1,000 |

Blanche did not receive $200,000 in cash from Starmount in exchange for her 2,000 redeemed shares. Instead, either Edward B. Benjamin or Edward B. Benjamin and Blanche directed the corporation to credit two accounts on the books of Starmount in the following amounts:

"Advances Account" (used by Blanche) _____ $155,700
"Accounts Receivable—Mr. & Mrs. Edward B. Benjamin" _____ 44,300

These entries completely extinguished existing deficits in the "Advances Account," in the amount of $155,700, and in the "Accounts Receivable—Mr. & Mrs. Edward B. Benjamin" account in the amount of $34,459.50. After these book entries, the "Accounts Receivable—Mr. & Mrs. Edward B. Benjamin" account had a credit balance of $9,840.50. These two accounts represented funds previously distributed as interest-free loans from Starmount to petitioners.

Petitioner Edward B. Benjamin (hereinafter Edward) was never a shareholder in Starmount. He was, however, president of the corporation from about 1931 until March of 1968, and was a member of the Starmount board of directors for a similarly long period of time. The board consisted of Blanche, Edward, and the third seat was always held by an attorney from the Greensboro law firm which represented Starmount. In addition to these duties with Starmount, Blanche executed an irrevocable voting trust in favor of her husband on January 9, 1962. Under the terms of this instrument, Blanche was obligated to have the class A and class B preferred stock reissued in her husband's name and Edward was given "the right to vote or otherwise represent * * * the shares covered by * * * [the] Voting Trust Agreement, for all intents and purposes as if such shares were owned by him individually for his own use and benefit."

Petitioners personally owned 110 acres of land near Greensboro which was known as Starmount Farms. This parcel of realty was originally a part of the tract Blanche acquired through foreclosure and petitioners purchased the property as part of the 1950 agreement. The petitioners resided at Starmount Farms about 3 months out of each year. During 1964, pursuant to Edward's instructions, the corporation paid $7,214.65 toward the maintenance of these premises.

Also during 1964, the corporation paid $864 to a Greensboro country club as dues for the three Benjamin sons. At that time, one son resided in Oregon and the other two in New Orleans.

On November 14, 1966, Revenue Agent Joseph Wilenzick, assigned to respondent's New Orleans office, began a field audit of petitioners' 1965 tax return. The audit was conducted at Edward's office in New Orleans. The audit was a thorough and detailed examination of petitioners' return and records pursuant to respondent's "taxpayer compliance measurement program." Such examinations, referred to as "TCMP" audits, have a two-fold purpose: (1) To comprehensively examine the return and business records of the individual taxpayer, and (2) to discover information helpful to the Commissioner in classifying and selecting other returns for audit. In addition to the TCMP audit of petitioners' 1965 return, Agent Wilenzick was assigned to routinely examine petitioners' 1964 and 1961 returns since a refund for 1961 had been granted following petitioners' application for a tentative carryback adjustment to that year for losses arising in 1964. The 1964 and 1961 audits were not assigned to Agent Wilenzick as TCMP examinations.

Present with Agent Wilenzick when he began his audit for 1965 was Frank Youngman, a certified public accountant who had prepared petitioners' 1964 and 1965 Federal income tax returns, and George R. Morris, longtime bookkeeper for the Benjamins. Mr. Youngman and Mr. Morris provided Agent Wilenzick with pertinent records and books of account and were both available to answer any questions. Mr. Youngman and Mr. Morris did not personally observe Agent Wilenzick as he conducted the entire examination.

Mr. Morris maintained a "Cash Book" which contained daily entries of business receipts and disbursements by petitioners. At the end of each month, Mr. Morris would total all the "Cash Book" entries and transfer the balances to the "Ledger." Agent Wilenzick was provided with two volumes of the "Cash Book," the first covering the period February 1, 1964, to April 30, 1965, and the second from May 1, 1965, through September 1966. Agent Wilenzick was also given access to the "Ledger" which was divided into several volumes and which contained records from 1954 through 1966.

Agent Wilenzick found the petitioners' 1965 return in proper order except for several deductions of club dues which were not

allowable. Agent Wilenzick also noted that these items appeared on petitioners' 1964 income tax return. The agent called these matters to the attention of Mr. Youngman and Mr. Youngman countered these proposed adjustments with some additional office expenses. Agent Wilenzick agreed with Mr. Youngman's counterproposal and his report of audit indicated no change was necessary to the 1965 return since the discrepancies offset each other.

Following his extensive examination of the petitioners' 1965 return, Agent Wilenzick prepared a "Survey After Assignment," Form 1900, with respect to the 1964 and 1961 returns. Such a form is a recommendation to the agent's superiors that an assigned audit not be conducted for reasons which surfaced after the assignment. Although Agent Wilenzick did have petitioners' 1964 return, and did visually inspect it, he recommended against an audit of petitioners' 1964 and 1961 returns for the reasons set forth in his "Survey After Assignment":

Taxpayer carried back his 1964 loss to 1961 through means of an Application for Tentative Carryback Adjustment. The loss was completely absorbed in 1961 and there was no excess to carry to a subsequent year.

This reporting agent has just concluded an extensive examination of taxpayer's 1965 return which was a TCMP assignment and has proposed acceptance of same as filed. The returns for the two years are almost identical, and there is small likelihood of a change being made to 1964 if a full scale audit be made. The results would definitely be proportional to the time involved. The return for 1961 is in good order also.

Consequently, it is recommended that the returns, including the acceptance of the tentative carryback be accepted as filed.

Agent Wilenzick did not inspect petitioners' books of account for 1964.

During the fall of 1969, Revenue Agent John F. Amend, assigned to respondent's Greensboro, N. C., office, began an audit of Starmount to cover several years, including 1964. Among other items, he was concerned about Starmount's possible unreasonable accumulation of earnings under section 531. In this regard, he noted the distribution made to Blanche in December of 1964. As a collateral matter but not a part of his audit, Agent Amend examined petitioners' 1964 tax return to see how petitioners had individually treated the distribution.

During the course of his audit, Agent Amend talked with Mr. McMillan, an employee of Starmount, and sought more information about the redemption transaction. Mr. McMillan

referred the agent to Messrs. Daniels and Pierce, the corporation's private counsel in Greensboro. In turn, the agent was referred to Edward for information.

Agent Amend met personally with Edward and discussed Starmount's 1964 redemption and petitioners' individual treatment of the distribution. Also, Agent Amend asked Edward for a copy of a 1959 private ruling issued by respondent to Starmount and Blanche which involved a proposed redemption very similar to the one at issue herein. Agent Amend knew of the existence of the ruling and that its determination was adverse to petitioners. Although the agent could have received the document from respondent's national office, he requested the document from Edward only in the interest of saving time. Edward voluntarily provided the agent with a copy of the ruling.

Apparently at the urging of Agent Amend and the Greensboro District, the New Orleans District transferred examination jurisdiction of petitioners' personal income tax return to the Greensboro District by letter dated November 13, 1969. Agent Amend then had access to petitioners' 1961, 1964, and 1968 income tax returns but at no time did he have access to nor inspect petitioners' 1964 books of account.

On February 18, 1970, after petitioners and their counsel had held further communications with Agent Amend, examination jurisdiction was returned to the New Orleans District. A statutory notice of deficiency was issued from the New Orleans District on February 25, 1971.

Agent Amend did not conduct an examination of petitioners' books of account.

In 1964, Starmount had sufficient current and accumulated earnings and profits to pay a dividend in the amount involved herein.

ULTIMATE FINDINGS OF FACT

Prior to and after the 1964 redemption, Blanche owned all the outstanding voting stock of the corporation (class A and B preferred); her sons and grandchildren owned all the nonvoting common; and Blanche, her sons, and grandchildren owned 3,398 of the 3,518 class C nonvoting preferred. The remaining 120 shares of class C preferred were held by two of Blanche's daughters-in-law.

OPINION

Before discussing the principal substantive issue presented herein we deem it appropriate to dispose of two preliminary matters raised by petitioners.

First, petitioners contend that agents of respondent conducted a second inspection of their "books of account" in violation of section 7605(b).[6] Specifically, petitioners assert that Agent Wilenzick first inspected their 1964 books of account while examining their 1964 and 1965 returns, and later, Agent Amend conducted an inspection without the requisite notice required by section 7605(b). The inspection of the books by Agent Amend, it is argued, was accomplished by the agent's questioning of Edward about matters contained in petitioners' books of account and his request for, and receipt of, a private ruling issued to Blanche and the corporation. Petitioners' legal argument is that any "meaningful exchange" between respondent and a taxpayer about matters contained in the taxpayer's records or books of account, which occurs after a prior inspection or examination, must be preceded by written notice in accordance with section 7605(b). Neither the facts nor the law sustained petitioners' position on this issue.

We have found that there was no first inspection of petitioners' 1964 books of account. Agent Wilenzick's testimony, corroborated by his "Survey After Assignment," indicates neither an inspection of petitioners' books of account nor a formal audit of petitioners' 1964 tax return occurred. Agent Wilenzick visually examined petitioners' 1964 return; however, a review of the Form 1040, and accompanying schedules, does not constitute an inspection of a taxpayer's "books of account." *Guerkink v. United States,* 354 F.2d 629 (7th Cir. 1965). See also *Pleasanton Gravel Co.,* 64 T.C. 510, 527-529 (1975).

Even assuming, arguendo, there was a first inspection of petitioners' books of account, we have also found that there was no second inspection by Agent Amend. Agent Amend never had possession of nor inspected petitioners' books of account. The 1964 redemption was discovered during an audit of a third party,

[6] SEC. 7605. TIME AND PLACE OF EXAMINATION.

(b) RESTRICTIONS ON EXAMINATION OF TAXPAYER.—No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary or his delegate, after investigation, notifies the taxpayer in writing that an additional inspection is necessary.

Starmount, and the inspection of the corporation's books does not constitute an inspection of petitioners' books. *Guerkink v. United States, supra; DeMasters v. Arend,* 313 F.2d 79 (9th Cir. 1963).

Section 7605(b) was enacted to prevent abusive and unnecessary inspections of a taxpayer's books and records by the tax collector. See *United States v. Powell,* 379 U.S. 48 (1964). The section was not designed to prevent the tax collector from diligently exercising his statutory duty of collecting the revenues. In this regard, the Court of Appeals for the Ninth Circuit has stated:

These grants of power [secs. 7601 and 7602] are to be liberally construed in recognition of the vital public purposes which they serve; the exception stated in Section 7605(b) is not to be read so broadly as to defeat them. A limited construction of Section 7605(b) is also supported by the law's general antipathy to the erection of barriers to ascertainment of truth, and the policy against judicial intervention in the investigative stage of tax matters because of the danger of undue delay in the collection of the revenues. [Fn. refs. omitted.]

*DeMasters v. Arend, supra* at 87. Neither the prohibition against an "unnecessary examination" nor the limitation upon the frequency of inspections of a taxpayer's books of account has here been violated. See *United States v. Schwartz,* 469 F.2d 977 (5th Cir. 1972); *DeMasters v. Arend, supra.*

To inspect the "books of account" would require, at a minimum, that the respondent have access to and physically view a taxpayer's books and records. Although Agent Wilenzick had access, we have found that he did not view petitioners' books. As to Agent Amend, he neither had access to nor physical control of petitioners' business records.

While we decide this issue on the facts, we feel compelled to expressly reject petitioners' legal argument as well. Section 7605(b) relates to the physical inspection of a taxpayer's books and records. Besides prohibiting repetitive inspections of books and records without notice, section 7605(b) affirmatively requires an investigation before a written notice may be issued. These requirements impose a restraint on overzealous revenue agents and prevent needless or harassing inspections. See *United States v. Powell, supra.* In the course of conducting an investigation, section 7605(b) does not prohibit oral communication with the taxpayer. Therefore, we find no violation of section 7605(b) because Agent Amend questioned Edward during the

audit of Starmount and elicited certain information which ultimately led to the deficiency herein. Similarly, we attach no significance to Agent Amend's request for a copy of the private ruling since he knew of its existence and could have obtained a copy from respondent's national office. Moreover, we believe that document was relevant to the audit of Starmount. Finally, if a first inspection did occur, Edward's voluntary cooperation in providing the ruling. waived petitioners' opportunity to now object. *M. O. Rife, Jr.,* 41 T.C. 732 (1964), revd. on other ground 356 F.2d 883 (5th Cir. 1966); *Philip F. Flynn,* 40 T.C. 770 (1963).

A second preliminary question has been presented by petitioner Edward B. Benjamin. Petitioner presents alternative arguments urging that the statute of limitations bars the issuance of a deficiency against him.

The joint notice of deficiency was mailed to petitioners more than 3 but less than 6 years after their return for 1964 was due to be filed. The normal limitations provision, sec. 6501(a), permits respondent to mail a notice of deficiency within 3 years after the due date of a timely filed return. Section 6501(e)[7] provides an exception where a taxpayer omits from gross income an amount properly includable therein which is in excess of 25 percent of the amount of gross income stated in the return. In such cases the respondent has 6 years in which to determine a deficiency.

As we understand his first argument, Edward bases his contention on the following reasoning. First, the phrase "the taxpayer" as used in section 6501(e)(1)(A) refers to each separate taxpayer-spouse on a joint return. Secondly, the 6-year period of limitations applies only to the individual taxpayer-spouse whose income was omitted from gross income and which was properly includable therein. And finally, since the $200,000 distribution was paid on stock belonging to his wife, Edward concludes that the 6-year statute is inapplicable as to him since he did not omit any income.

---

[7] SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION.

(e) SUBSTANTIAL OMISSION OF ITEMS.—Except as otherwise provided in subsection (c)—

(1) INCOME TAXES.—In the case of any tax imposed by subtitle A—

(A) GENERAL RULE.—If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. For purposes of this subparagraph—

Petitioner seeks to support his major and minor premises by drawing a distinction between the language contained in sections 6501(c)(1)[8] and 6501(e)(1)(A). While section 6501(c)(1) extends indefinitely the limitations period for a "false or fraudulent return" so that both spouses who file jointly may be held liable where fraud is proven against one or both, *Kathleen C. Vannaman,* 54 T.C. 1011 (1970), petitioner contends that section 6501(e)(1)(A) limits its consequences, in the case of a joint return, to the specific taxpayer-spouse whose income was omitted. We disagree with the interpretation.

Section 6013(a) permits married individuals to file a joint income tax return which, generally, results in tax savings to the husband and wife. Even where one spouse has little or no income, the income reported is computed on an aggregate basis. In accepting the benefits of filing jointly, the spouses also assume joint and several liability for the payment of any tax due. Sec. 6013(d)(3); sec. 1.6013-4(b), Income Tax Regs. Tax liability is based on the aggregate income reported (or that should have been reported) and respondent may seek assessment and collection from either or both taxpayer-spouses who have jointly declared an aggregate income and freely signed a joint return. *Gaylord C. Peters,* 51 T.C. 226 (1968). There are two taxpayers on a joint return; however, there is but a single income. *Robert A. Coerver,* 36 T.C. 252 (1961), affd. per curiam 297 F.2d 837 (3d Cir. 1962).

Where married individuals file a joint return, the income reported does not reflect whether the income is joint or the separate income of each spouse. Each spouse shares an equal responsibility to accurately report *all* income of the marital community. Where income is omitted on a joint return, the omission constitutes a failure to report income by each spouse. The statute only requires an omission for the extended limitations period to apply regardless of which spouse earned or received the omitted income. Thus the term "taxpayer" as used in section 6501(e)(1)(A) includes each taxpayer-spouse on a joint return. Each taxpayer, husband and wife, has *omitted* income, and the statute of limitations applies to both spouses, where

---

[8] SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION.—
(c) EXCEPTIONS.—
(1) FALSE RETURN.—In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.

respondent proves that a sum was "properly includable" in the aggregate gross income of the joint taxpayers and was in excess of 25 percent of the gross income reported. No other interpretation would be consistent with the well-established rule that spouses filing a single joint return are jointly and severally liable. See *Myrna S. Howell,* 10 T.C. 859, 867-868 (1948); H. Rept. No. 1860, 75th Cong., 3d Sess. 29-30 (1938). The word "taxpayer" is simply too commonplace in the Federal taxing statute to attribute special meaning to its singular use without considering the context in which it is employed and the result Congress intended in the particular provision.

Petitioner could find no judicial authority in direct support of his proposition nor has our investigation revealed any. Petitioner has drawn our attention to several cases wherein we have interpreted "taxpayer" as meaning each separate taxpayer on a joint return or where we have emphasized that, in certain circumstances, each spouse on a joint return retains his or her separate identity. See *Henry M. Rodney,* 53 T.C. 287 (1969); *Kathleen C. Vannaman, supra; Nadine I. Davenport,* 48 T.C. 921 (1967); *Marie A. Dolan,* 44 T.C. 420 (1965); *Estate of Lillian V. Sperling,* T.C. Memo. 1963-260, affd. 341 F.2d 201 (2d Cir. 1965). We recognize the import of each of those cases. But nothing in those decisions persuades us, for purposes of section 6501(e)(1)(A), that one joint-filing spouse is exempted from the reach of the statute of limitations because the omitted income is attributable to the other spouse.

Congress has recognized that inequity and hardship sometimes befall one spouse who is held liable for taxes on income omitted and attributable solely to the other spouse. The enactment of the so-called "innocent spouse" provision, sec. 6013(e),[9] provides

---

[9] SEC. 6013. JOINT RETURNS OF INCOME TAX BY HUSBAND AND WIFE.

(e) SPOUSE RELIEVED OF LIABILITY IN CERTAIN CASES.—

(1) IN GENERAL. Under regulations prescribed by the Secretary or his delegate, if—

(A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return,

(B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and

(C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission,

then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income.

relief for certain spouses who otherwise would be liable for taxes due on income omitted by the other spouse. This provision does not disturb the rules relating to the statute of limitations but, rather, absolves the innocent spouse from liability where certain conditions are satisfied. This provision, contrary to the limitations provision contained in section 6501(e)(1)(A), does require the delineation of income between the spouses. Sec. 6013(e)(1)(A). Petitioner wisely did not argue that he was entitled to the protection of section 6013(e) since one of the conditions to qualify under this provision is that the innocent spouse must establish "that in signing the return he or she did not know of, and had no reason to know of, such omission." Sec. 6013(e)(1)(B). Petitioner clearly had knowledge of this omission since he was president of Starmount in 1964 and together with his wife directed the corporation to make the distribution.

Edward's alternative argument is based on the premise that the distribution from Starmount was Louisiana community income so that each spouse had a $100,000 gain. He then reasons that his $100,000 omission does not exceed by 25 percent the gross income reported on the joint return. We reject this argument.

First, implicit in our previous discussion was the point that the determination of ownership rights as between the spouses is immaterial where, as here, there is no dispute that the gain was the property of one or both of the petitioners. The income reported on a joint return is an aggregate figure which does not disclose the ownership of that income under State law. "The state law creates legal interests but the Federal statute determines when and how they shall be taxed." *Burnet v. Harmel,* 287 U.S. 103, 110 (1932). Secondly, the statute requires that we compare the omitted income with the gross income reported in the return. The omission here, as a result of the Starmount distribution, was $200,000. Finally, neither the statute nor logic would permit the petitioner to split the omitted income between the spouses and compare it with the spouses joint income in determining whether the 25 percent test has been satisfied.

Respondent has met his burden of showing, quantitatively, that petitioners omitted a sum in excess of 25 percent of their reported income. We now turn to the main issue of whether the

sum constituted taxable income which should have been recognized by petitioners. If the amount was "properly includable" in petitioners' 1964 return, the deficiency was timely. Sec. 6501(e).

The tax treatment of distributions of property from a corporation to its shareholders is generally governed by the provisions of sections 301 and 316. The distribution is includable in the distributee's gross income and is taxable as a dividend if the corporation has sufficient earnings and profits. "The hallmarks of a dividend * * * are pro rata distribution of earnings and profits *and* no change in basic shareholder relationships." *Himmel v. Commissioner,* 338 F.2d 815, 817 (2d Cir. 1964), revg. 41 T.C. 62 (1963). An exception to this general pattern is contained in section 302(a) which, if certain tests in section 302(b) are satisfied, qualifies redemptions for sale or exchange treatment so as to be taxed at capital gain rates to the extent the value of the property received exceeds the adjusted basis of the stock. If the redemption does not satisfy the requirements of section 302(b), section 302(d) causes the transaction to be taxed as a dividend under section 301.

We are asked to decide whether the distribution here in issue qualifies as a redemption, or stated otherwise, whether the distribution is "not essentially equivalent to a dividend" as that phrase is used in section 302(b)(1).[10] Our concern is with the 1964 redemption whereby the Starmount company purchased for redemption 2,000 shares of class A preferrred stock from Blanche for the sum of $200,000, the payment of which was made by canceling certain obligations owed to Starmount by petitioners, leaving a credit balance in one of the accounts in the amount of $9,840.50.

The history of the "essentially equivalent to a dividend" language contained in section 302(b)(1) has often been recounted in other cases and treatises. See, e.g., *United States v. Davis,* 397 U.S. 301 (1970); *Ballenger v. United States,* 301 F.2d 192 (4th Cir. 1962); Bittker & Eustice, Federal Income Taxation of

---

[10] SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

(a) GENERAL RULE.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

(b) REDEMPTIONS TREATED AS EXCHANGES.—

(1) REDEMPTIONS NOT EQUIVALENT TO DIVIDENDS.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.

Corporations and Shareholders, pars. 9.01, 9.02, 9.03 (3d ed. 1971). However, we feel compelled to trace in brief fashion the development of this statutory phrase since petitioners vigorously urge on brief that such matters are relevant and beneficial to their position.

Congress first employed the "essentially equivalent" language in section 201(d) of the Revenue Act of 1921.[11] That provision was a response to the decision of the Supreme Court in *Eisner v. Macomber*, 252 U.S. 189 (1920), and was designed to combat a two-step scheme whereby corporate earnings were being distributed at capital gain rates. With refinements to the statute added by the Revenue Acts of 1924[12] and 1926,[13] Congress enacted the first sentence of the 1926 provision as section 115(g) of the Internal Revenue Code of 1939.[14]

Section 115(g) was the sole provision in the 1939 Code which qualified a transaction for redemption treatment. Decisions under the 1939 Code were primarily factual determinations and a variety of factors were employed to help gauge whether the distribution more resembled a sale or a dividend. These decisions created a lack of certainty and predictability and the "morass created by the decisions"[15] under the 1939 Code gave the draftsmen of the 1954 Code a fertile area for statutory clarification.

The House version of the 1954 Code eliminated the factual equivalency approach of section 115(g) in favor of more precise mechanical rules such as those contained in present subsections 302(b)(2) (substantially disproportionate redemptions) and 302(b)(3) (complete termination of a shareholder's interest).[16] The intent of the House seems clear—the elimination of the confusion and uncertainty which had plagued taxpayers, and

---

[11] Revenue Act of 1921, ch. 136, 42 Stat. 227.

[12] Revenue Act of 1924, ch. 234, 43 Stat. 253.

[13] Revenue Act of 1926, ch. 27, 44 Stat. 9.

[14] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(g) REDEMPTION OF STOCK.—

(1) IN GENERAL.—If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

[15] *Ballenger v. United States,* 301 F.2d 192 (4th Cir. 1962).

[16] Present subsec. 302(b)(4), relating to railroad reorganizations, is not considered in this discussion because of its specialized application.

courts, in determining dividend equivalency under section 115(g).[17]

The Senate rejected this modification as too inflexible and reinserted the "essentially equivalent to a dividend" test.[18] In addition, two of the mechanical tests or "safe harbors" contained in the House bill were retained and together these three elements were enacted as subsections 302(b)(1), (b)(2), and (b)(3). Section 302(b)(5) stated that the protection of section 302(b)(1) is exclusive and not dependent upon whether the transaction qualifies under subsection 302(b)(2) or (b)(3).

The confusion and uncertainty that existed in cases decided under section 115(g) of the 1939 Code continued after 1954. With the exception of the Second Circuit, a legitimate business purpose for the redemption was given great weight in according sale or exchange treatment to a transaction as opposed to the harsher dividend characterization. See *Levin v. Commissioner,* 385 F.2d 521 (2d Cir. 1967); *Hasbrook v. United States,* 343 F.2d 811 (2d Cir. 1965); compare *Perry S. Lewis,* 47 T.C. 129 (1966). The confusion in approaching a resolution of these cases was caused by the similarity in language contained in section 302(b)(1) and its predecessor, section 115(g), and the fact that the legislative history did not disclose how much prior law was to be retained nor delineate what type of transactions were entitled to the protection of section 302(b)(1). See *United States v. Davis, supra.*

The Supreme Court cleared some of the haze surrounding section 302(b)(1) with its decision in *Davis.* The taxpayer owned 25 percent of the common stock and all of the corporation's non-voting $25 par value preferred stock. Davis' wife and two children each held 25 percent of the common stock. The preferred shares were originally purchased by Davis to improve the corporation's balance sheet in order to qualify for a loan from the Reconstruction Finance Corporation. It was understood that following the repayment of the loan the corporation would redeem the preferred shares at par value. Upon the redemption of the preferred shares, respondent determined the distribution

---

[17] See H. Rept. No. 1337, 83d Cong., 2d Sess. (1954).

[18] S. Rept. No. 1622, 83d Cong., 2d Sess. 233 (1954) states:

"In lieu of the approach in the House bill, your committee intends to revert in part to existing law by making the determination of whether a redemption is taxable as a sale at capital gains rates or as a dividend at ordinary income rates dependent, except where it is specifically provided otherwise, upon a factual inquiry."

was "essentially equivalent to a dividend" and the Supreme Court agreed. The Court, after applying the attribution rules of section 318(a) so as to render Davis the constructive owner of the stock held by his wife and children, held that a redemption of a portion of a sole shareholder's stock "is always 'essentially equivalent to a dividend.'" 397 U.S. at 307. In order for a redemption to qualify under section 302(b)(1) the distribution must effect "a meaningful reduction of the shareholder's proportionate interest in the corporation." 397 U.S. at 313. Additionally, the Court agreed with the Second Circuit that business purpose or motivation for the distribution is irrelevant in determining dividend equivalency.

From our investigation of the statute, its legislative history, and particularly the *Davis* decision and its progeny, we begin our inquiry being mindful of these guideposts. (1) For a distribution to qualify as a redemption under section 302(b)(1), our task is to determine "whether the transaction by its nature may properly be characterized as a sale of stock by the redeeming shareholder to the corporation." S. Rept. No. 1622, *supra* at 234. Because a dividend has the effect of reducing the corporation's earnings and profits while the shareholder's interest inter se and vis-a-vis the corporation remains unchanged, an effective redemption under section 302(b)(1) must result in "a meaningful reduction in the shareholder's proportionate interest in the corporation." 397 U.S. at 313. (2) A partial redemption of stock held by a sole shareholder (whether ownership is actual or constructive) "is always 'essentially equivalent to a dividend.'" 397 U.S. at 307. (3) The business purpose of either the original issue of the stock or its later redemption is irrelevant. *United States v. Davis, supra; Hasbrook v. United States,* 343 F.2d 811 (2d Cir. 1965). See *Bradbury v. Commissioner,* 298 F.2d 111 (1st Cir. 1962), affg. a Memorandum Opinion of this Court. (4) The family rules of stock attribution contained in section 318(a) ordinarily apply to section 302(b)(1) transactions. *United States v. Davis, supra;* but see *Robin Haft Trust,* 61 T.C. 398 (1973), Supplemental Opinion, 62 T.C. 145 (1974), vacated and remanded 510 F.2d 43 (1st Cir. 1975).

The petitioners argue two theories. First, petitioners press the argument that the "meaningful reduction" standard of *Davis* has been satisfied since the distribution significantly decreased Blanche's net worth in Starmount. Petitioners rely on the limita-

tions contained in the 1950 agreement restricting Blanche to a return of $100 per share and cite *Himmel v. Commissioner, supra,* as authority for the proposition that a substantial reduction in net worth bars a finding of dividend equivalency. Further, petitioners assert that the ownership of the common and C preferred stock held by Blanche's sons and grandchildren should not be attributed to her under section 318(a) because of the "family hostility" exception formulated in *Estate of Arthur H. Squier,* 35 T.C. 950 (1961), and followed in *Herbert C. Parker,* T.C. Memo. 1961-176 (1961). This latter element is an indispensable part of petitioners' first argument since with attribution Blanche would be deemed the owner of all Starmount stock save a small fraction of the C preferred.

Secondly, the petitioners argue that the redemption at issue was carried out pursuant to a binding agreement or plan (the 1950 agreement) which was executed prior to the revision of the Code in 1954. Under this theory petitioners argue that a plan existed to completely ·terminate the taxpayer's interest in Starmount and the 1964 redemption was but one step in an overall integrated plan. As with the first argument, the petitioners assert that the family stock attribution rules are inapplicable because· of the "bad blood" exception and additionally since a waiver of those rules under section 302(c)(1)(A) was filed with the final redemption in 1968. We shall consider the attribution question first.

For purposes of section 302, the ownership of stock held by an individual or entity is normally attributed to related persons or entities as specified in section 318. Sec. 302(c). The underlying rationale for attributing stock ownership is that persons or entities so related will act in concert and for the benefit of each other. In *Estate of Arthur Squier, supra,* and *Herbert C. Parker, supra,* we found under the circumstances there present, and despite the rules of constructive ownership which rendered the redeemed shareholder a majority shareholder, the respective transactions qualified as redemptions. Because of the hostility which existed between the related parties, we placed great emphasis on the actual loss or shifting of control which occurred as a result of the respective redemptions.

In *Robin Haft Trust, supra,* we reviewed our position in *Squier.* We determined that the intervening *Davis* decision compelled strict application of the attribution rules regardless of

whether family discord might have altered the community-of-interest rationale underlying section 318. On appeal the First Circuit disagreed with our conclusion, 510 F.2d 43, and held that a determination under 302(b) cannot end with the mechanical application of the attribution rules. Rather, in determining dividend equivalency, an examination of all the facts and circumstances must include consideration of "the existence of family discord tending to negate the presumption that taxpayers would exert continuing control over the corporation despite the redemption." 510 F.2d at 48.

After carefully considering the parties' positions on this issue, we believe the facts and circumstances present here serve to distinguish this case from *Squier, Parker,* and *Haft.* For example, in *Squier* and *Parker* there was an actual shifting of control between competing entities or individuals. Here on the other hand, Blanche retained absolute control over Starmount activities following the redemption. See *Haft Trust v. Commissioner,* 510 F.2d 43, 48 (1st Cir. 1975). We find it unnecessary to unravel this knotty problem since it would be inconsequential to the result we reach. If the attribution rules are applied, then Blanche would be deemed a sole shareholder because of her absolute or substantial percentage holdings of each class of stock.[19]See *Bradbury v. Commissioner,* 298 F.2d 111 (1st Cir. 1962); *Keefe v. Cote,* 213 F.2d 651 (1st Cir. 1954). In that posture the case would fall squarely under *Davis.* If the attribution rules are not applied, the same result obtains since we hold that the redemption of 2,000 voting shares owned by Blanche did not meaningfully reduce her interest in the corporation. Without deciding this question, we will proceed on the assumption that the attribution rules are inapplicable.

As to petitioners' first argument, we disagree that any reduction in Blanche's net worth occasioned by the redemption

---

[19] Before and after the 1964 redemption, Blanche held the following percentage interest in each class of stock:

| Class | Percentage of ownership | Type of ownership |
|---|---|---|
| A preferred (voting) | 100 | Actual |
| B preferred (voting) | 100 | Actual |
| C preferred | 97 | Actual and constructive (3% held by Blanche's daughters-in-law) |
| Common | 100 | Constructive |

of the preferred stock, whether such reduction was real or due to the limitations imposed by the 1950 agreement, is sufficient to prevent a finding of dividend equivalency. The argument fails to comprehend the significance of Blanche's retention of absolute voting control. Furthermore, we believe petitioners have placed undue reliance on the restrictions of the 1950 agreement and the fact that the redeemed stock was denominated "preferred." We shall consider each of these items separately.

While the 1950 agreement between Blanche and her sons may have been binding as between them, it is not determinative of the character of a distribution passing from the corporation to Blanche for purposes of Federal taxation. The 1950 agreement was executed by three parties—Blanche, as income beneficiary of certain trusts; her sons, remaindermen under the same trusts; and the corporate trustee. The primary object of the agreement was the revocation of the trusts. The sons were parties to the agreement because of their position as remaindermen and only subsequently, by virtue of the agreement, did the sons become the common shareholders of Starmount. The sons received as partial consideration for their consent to the revocation of the trusts (1) the common stock of Starmount, (2) Blanche's promise to donate to them her A and B preferred shares upon the receipt of $100 per share from capital or income, (3) Blanche's promise to bequeath to them her C preferred, and (4) the right to a class vote on the liquidation of Starmount or future charter amendments.

The cumulative limitation on Blanche's economic return was a contingency which, if it occurred, would obligate her to donate equally to her sons her A and B preferred shares. The limitations imposed by the agreement ran between Blanche and her sons. The agreement between the members of the Benjamin family was simply a promise to make a gift upon the occurrence of a contingency. And whether that contingency occurred was dependent on Blanche since she held all the voting stock of Starmount. Under petitioners' first theory, we conclude that the 1950 agreement has no bearing on the tax consequences of a distribution flowing from a separate entity, the corporation, to Blanche.

Petitioners have taken maximum advantage of the "preferred" label affixed to the stock held by Blanche in urging that a redemption of preferred stock generally qualifies as a redemption

under section 302(b)(1). They have attempted to paint a picture showing the Starmount A and B preferred as stock laden with restrictions and limitations (primarily due to the 1950 agreement) and further that the actions of the voting shareholder were subject to constant common shareholder objection. Moreover, petitioners on brief have cited cases and secondary sources discussing common and preferred stock, as those terms are generally understood, without distinguishing the vast differences which exist between most preferred stock and the Starmount A and B preferred. Their argument obscures reality and seeks to compare apples and oranges. We are not swayed by labels and will look at substance over form in considering the character of the redeemed stock.

The A and B preferred possessed dividend and liquidation preferences normally associated with senior securities and, additionally, the voting characteristic of most common stock. The history of the corporation indicates that the stock was an equity interest, see *Isidor Dobkin,* 15 T.C. 31 (1950), affd. 192 F.2d 392 (2d Cir. 1951), and that Blanche held the A and B shares at her pleasure. The record discloses nothing indicating Blanche held the voting stock temporarily or that she was obligated to divest herself of the voting stock in the future. Her retention of the A and B preferred entitled Blanche to complete management control as she, exercising her best business judgment, deemed appropriate.

The common shareholders had no current interest in the corporation (Starmount had never declared a dividend) nor were they privy to Starmount business affairs. We find nothing in the charter or 1950 agreement which would give the common shareholders the power to force a redemption of the preferred, or the declaration of a dividend, or otherwise interfere with corporate activities in the absence of fraud, bad faith, or arbitrary and oppressive conduct by the voting shareholders. See *Gaines v. Long Mfg. Co.,* 234 N.C. 331, 67 S.E.2d 355 (1951).

The splitting of ownership and control by the use of a multiclass capitalization is not uncommon particularly in a family corporation where the family members anticipate a transition of control and ownership from one generation to another. But even if we infer a scheme to transfer ownership and control, the obligations imposed by a side agreement between family

members do not determine the character of distributions from the corporation used to displace that control.

We turn now to the crucial element which persuades us that the distribution did not meaningfully reduce Blanche's interest in the corporation. Controlling the activities of a family corporation through voting superiority, or supremacy, is the most significant attribute a shareholder possesses. See *Fehrs Finance Co.,* 58 T.C. 174, 187-188 (1972), affd. 487 F.2d 184 (8th Cir. 1973); cf. *Estate of Arthur H. Squier, supra.* Such voting control normally carries with it the power to declare dividends and approve a liquidation in addition to other economic advantages such as controlling, through the board of directors, the timing of dividends and redemptions, appointing and fixing the salaries of officers and authorizing loans. Although neither Blanche nor her husband received salaries as officers of Starmount, they did receive interest-free loans and personally controlled the call of the stock here in issue. Where, as here, there is no diminution in absolute voting control after the redemption, it is difficult to perceive any *meaningful* reduction in the redeemed shareholder's interest in the corporation or in her relation to the residual shareholders. *United States v. Davis, supra;* see also *John D. Gray,* 56 T.C. 1032, 1071 (1971), pending on appeal to 9th Cir.; *Estate of William F. Runnels,* 54 T.C. 762 (1970).

Whatever changes in net worth and participation in earnings Blanche experienced as a result of the distribution, factors considered by the Second Circuit in *Himmel v. Commissioner, supra,* in our opinion the retention of absolute voting control in the present case outweighs any other consideration. Cf. *Estate of Henry P. Lammerts,* 54 T.C. 420, 444 (1970), remanded for other reasons 456 F.2d 681 (2d Cir. 1972). Without any reduction in control, the distribution savors of a dividend. Cf. *Commissioner v. Berenbaum,* 369 F.2d 337 (10th Cir. 1966), revg. a Memorandum Opinion of this Court; *Bradbury v. Commissioner, supra.* It is apparent from the legislative history of section 302(b)(1) that Congress considered the element of control. In S. Rept. No. 1622, 83d Cong., 2d Sess. 44 (1954), the committee states:

While the House bill sets forth definite conditions under which stock may be redeemed at capital-gain rates, these rules appeared unnecessarily restrictive, *particularly* in the case of redemptions of preferred stock which might be called

by the corporation without the shareholder having *any control* over when the redemption may take place. [Emphasis supplied.]

Here, Blanche had absolute control over the redemption. Where the redeemed shareholder has sufficient voting power to control the activities of the corporation   including distributions to himself, and where he retains that same degree of control after a redemption distribution, such circumstances are strong indications that the transaction does not come within the confines of section 302(b)(1). *John D. Gray, supra* at 1071-1072; see Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 9.24 (3d ed. 1971); sec. 1.302-2(a), Income Tax Regs.

Based on the totality of the facts and circumstances here involved, we cannot find that Blanche meaningfully reduced her interest in Starmount. Neither the magnitude of the redemption nor any reduction in Blanche's net worth persuades us that the distribution was in the nature of a sale. Rather, we hold as to petitioners' first theory that the redemption was "essentially equivalent to a dividend," *United States v. Davis, supra.*

Petitioners next argue that the 1964 redemption was but one step in an overall plan to redeem or retire all of Blanche's stock interest in Starmount. Dividend equivalency has been avoided where several redemptions which are component parts of a single transaction are utilized to terminate a shareholder's stock interest. *In Re Luken's Estate,* 246 F.2d 403 (3d Cir. 1957), revg. 26 T.C. 900 (1956); *Bains v. United States,* 289 F.2d 644 (Ct. Cl. 1961); *Jackson Howell,* 26 T.C. 846 (1956), affd. sub nom. *Phelps v. Commissioner,* 247 F.2d 156 (9th Cir. 1957); *Carter Tiffany,* 16 T.C. 1443 (1951). To constitute a plan, the terms of the arrangement must be firm and fixed and the steps clearly integrated. *Bernard E. Niedermeyer,* 62 T.C. 280, 291 (1974); *Otis P. Leleux,* 54 T.C. 408, 418 (1970); *Isidore Himmel,* 41 T.C. 62, 75 (1963), revd. on other grounds 338 F.2d 815 (2d Cir. 1964); see *Estate of Oscar L. Mathis,* 47 T.C. 248 (1966).

As we construe petitioners' argument, they are attempting to show two things: (1) That Congress intended section 302(b)(1) to insulate redemption transactions called for by pre-1954 agreements from dividend taxation, and (2) that there existed an agreement of such binding effect as to constitute a plan of redemption.

With regard to the first point, petitioners assert that the legislative history of section 302(b)(1) indicates a concern by Congress to protect those "trapped" by preexisting agreements. Petitioners cite as authority for the conclusion testimony of several members of the tax bar given at hearings before the Senate Finance Committee in 1954 relating to then proposed section 309. Hearings on H.R. 8300. Before the Senate Comm. on Finance, 83d Cong., 2d Sess. pt. 1, 501, 522, and pt. 3, 1531 et seq. (1954). We accord no weight to such testimony. Cf. *Mississippi River Fuel Corp. v. United States,* 314 F.2d 953, 956 (Ct. Cl. 1963); *Budd Co. v. United States,* 148 F. Supp. 792, 800 (E.D. Pa. 1957), affd. 252 F.2d 456 (3d Cir. 1957).

Petitioners also contend that the cited portion of S. Rept. No. 1622, *supra* at 38, herein, is relevant and applicable to the present case. Blanche claims she is within a class of persons for whom Congress had a particular concern since she held "preferred stock" and had no control over the redemption. Petitioners support this claim by asserting that Blanche was required by the 1950 agreement, and further obligated by a common understanding among all shareholders, to redeem her stock as soon as possible.

We disagree with petitioners' reading of the Senate committee report. We interpret the reference to "preferred stock" as meaning nonvoting stock. This is consistent with the last portion of the sentence which describes the preferred shareholder as one without "any control" over the redemption and the only logical definition of "control" is voting power.[20] It would stretch reason too far to assume Congress envisioned the situation at bar.

Nevertheless, whatever shred of support petitioners draw from this language, it is beneficial to petitioners' cause only if Blanche can show she had no control because of a binding plan to redeem. This she has failed to do.

The evidence at trial failed to disclose any common understanding by the Starmount shareholders, the Benjamins, as to the time or procedure for the redemption of the Starmount stock. Blanche testified that a redemption or retirement of her stock was something in the "nebulous future." Her husband, Edward, stated that the redemption was to be effected "as soon as possible." Similarly, her son, Edward, Jr., a common share-

---

[20] See Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 9.24 (3d ed. 1971); sec. 1.302-2(a), Income Tax Regs.

holder, indicated that the redemption or redemptions were to begin when the corporation was in a good financial position. Such vague anticipation is not a firm plan with fixed conditions. Cf. *Friend v. United States,* 345 F.2d 761 (1st Cir. 1965); *Henry McK. Haserot,* 46 T.C. 864, 867-868 (1966), affd. sub nom. *Commissioner v. Stickney,* 399 F.2d 828 (6th Cir. 1968), on remand from 355 F.2d 200 (6th Cir. 1965).

Likewise, the 1950 agreement is lacking in specificity and certainty.[21] The agreement does not expressly require nor obligate Blanche to redeem her A and B preferred, nor fix the conditions for such a sale. While the agreement does, by implication, encompass a stock redemption, it also includes provisions dealing with the inter vivos and testamentary disposition of her stock which tends to indicate a long and indefinite retention of voting control by Blanche. We believe the sons had no assurance when or if the preferred stock would be redeemed or transferred to them nor is it certain whether Blanche could defeat their expectancies by selling, donating, or bequeathing even 1 share of voting stock to a third person not a party to the 1950 agreement.

Petitioners' contention that a plan existed seems to be "afterthought rather than prearrangement." *Otis P. Leleux, supra* at 418. Our close examination of the voluminous record, particularly those documents relating to the 1964 redemption, uncovers no reference to a concrete plan or scheme for the redemption of the stock. While we must take notice that Blanche did terminate her stock interest in Starmount in 1968, we are unable to find a link connecting these two transactions. We therefore conclude that the 1964 redemption was not a step in a firm and fixed plan of redemption.

Petitioners have presented numerous subsidiary arguments. We find no merit in their contentions that Blanche retained her voting control merely as a security device or that her preferred shares represented debt as opposed to equity. Further we are not

---

[21] Respondent in his reply brief raised for the first time the issue of the enforceability of the 1950 agreement. We deem it unnecessary to decide whether the agreement was legally enforceable under Louisiana law, if that is the law that controls, for two reasons. First, without reaching the legal question of whether the agreement is enforceable, we find as a matter of fact that the agreement is so imprecise that it does not constitute a binding plan calling for the redemption or retirement of Blanche's stock. Secondly, we hold that this issue has been raised in an untimely manner. Respondent has agreed to certain stipulations concerning the agreement and has reserved the right to object only to the relevancy or materiality of the 1950 agreement.

persuaded that Blanche was under a fiduciary duty to redeem her preferred shares. The only limits on her exercise of control were the general standards of fiduciary care and duty owed by a controlling shareholder, officer, and director. *Pepper v. Litton,* 308 U.S. 295 (1939).

Petitioners' further presentation of matters relating to the history of Starmount, its unusual capital structure, and why sound corporate policy dictated the 1964 redemption are all elements of the question of business purpose. After *Davis* such matters are irrelevant and our inquiry must be confined to the effect of the redemption, not the purpose behind it. Cf. *Joseph Miele,* 56 T.C. 556 (1971), affd. per curiam 474 F.2d 1338 (3d Cir. 1973), cert. denied sub nom. *Albers v. Commissioner,* 414 U.S. 982 (1973); *Rose Ann Coates Trust,* 55 T.C. 501 (1970), affd. 480 F.2d 468 (9th Cir. 1973); *Ray A. Maher,* 55 T.C. 441 (1970), affd. on this issue 469 F.2d 225 (8th Cir. 1972).

When the smoke surrounding this transaction is cleared, Blanche simply had her indebtedness to the corporation canceled through a disguised dividend. "Had the debt simply been cancelled, it would surely have been a dividend; the redemption of some stock in no way changes the effect of the transaction." *McGinty v. Commissioner,* 325 F.2d 820, 822 (2d Cir. 1963), affg. 38 T.C. 882 (1962); *Estate of William F. Runnels, supra; Bradbury v. Commissioner, supra.*

As to the corporate disbursements which respondent contends were constructive dividends, we agree that the amount expended by the corporation for the upkeep and maintenance of petitioners' residence, Starmount Farms, constitutes income. The payment by a corporation of a dominant shareholder's personal living expenses, where there is no business advantage to be gained by the expenditure, is equivalent to a dividend distribution to the shareholder. *Louis Greenspon,* 23 T.C. 138 (1954), affd. on this issue 229 F.2d 947 (8th Cir. 1956). With regard to the payment of the sons' country club dues, we believe that expenditure represented a benefit passing to the sons, also shareholders in the corporation, and should not be taxed to petitioners.

Decisions will be entered under Rule 155.

Reviewed by the Court.

IRWIN, *J.*, concurring: Although I agree with the result reached in this case, I wish to add the following comments. In relying on Mrs. Benjamin's retention of "voting control," we seem to ignore the fact that all of the voting preferred stock had been placed in a voting trust in 1962. The terms of the trust suggest that Mrs. Benjamin did not have voting rights either before or after the 1964 redemption. However, petitioners have repeatedly referred to Mrs. Benjamin as the "controlling shareholder" and the point has not been specifically addressed by the parties. For these reasons, we have treated Mrs. Benjamin as the controlling shareholder, notwithstanding the existence of the voting trust, and we have made no determination as to the effect of the voting trust on her interest in the corporation.

FAY and SIMPSON, *JJ.*, agree with this concurring opinion.